WILLARD P. PHILLIPS, trustee, *vs.* EASTERN RAILROAD
COMPANY & others.

Suffolk.　March 25. — Nov. 3, 1884.　DEVENS & COLBURN, JJ., absent.

The St. of 1876, c. 236, authorizing the Eastern Railroad Company to mortgage its
property to trustees to secure certificates of indebtedness to be issued to its
creditors, payable thirty years from date, and providing for a scheme by which
the net earnings of the corporation should be applied to the creation of a sink-
ing-fund for the payment of such certificates, does not prevent the execution
of a lease by the railroad company of its property to another railroad com-
pany, under the St. of 1880, c. 205, whereby the net earnings of the Eastern
Railroad Company are not separately ascertainable, and a different provision
is made for a sinking-fund, unless it appears that the rights of the holders of
certificates of indebtedness, secured by the mortgage executed in pursuance of
the St. of 1876, are injuriously affected.

Section 13 of the St. of 1876, c. 236, defined the operating expenses of a certain
railroad to include "necessary expenditures for construction, insurance, taxes,
renewals and repairs needful to maintain its road and equipment in good condi-
tion." *Held,* that the last ten words quoted related to and qualified only the
three words immediately preceding, and did not qualify the words "necessary
expenditures for construction."

Under § 13 of the St. of 1876, c. 236, the Eastern Railroad Company has merely
power to sell property not needed for the operation of its railroad, and to apply
the proceeds to a sinking-fund, but is not bound to make sales of it; and it is
no objection to a lease of its property to another railroad company, under the
St. of 1880, c. 205, that the lease includes such property, and thereby prevents
the proceeds of sales being applied to the sinking-fund.

The St. of 1876, c. 236, authorized the Eastern Railroad Company to mortgage its
property to trustees, to secure certificates of indebtedness, to be issued to its
creditors, payable in thirty years, and provided a scheme by which the holders
of certificates were to choose two thirds, and the stockholders one third, of the
directors, until the debt should be reduced to a certain sum, when the power of
the holders of such certificates to choose directors should cease. Until the debt
should be reduced to the sum stated, all the net earnings were to be applied to
the creation of a sinking-fund, and, when so reduced, a certain sum annually
was to be so applied. The St. of 1880, c. 205, authorized the Eastern Railroad
Company to lease its property to another railroad company. The St. of 1882,
c. 177, authorized the Eastern Railroad Company to increase its capital stock
by issuing preferred stock to a certain amount, in exchange for certificates of
indebtedness, and provided that such certificates, when received, should be can-
celled, and that the holders of such preferred stock should receive dividends
out of the net earnings not exceeding a certain amount, semiannually, in such
sums as the directors might determine; and that nothing contained in the act
should affect the rights of the holders of certificates under the St. of 1876, or
authorize payments from the earnings of the corporation, except subject to the
claims and charges created by the St. of 1876, and the mortgage. The East-
ern Railroad Company, after this, proposed to execute a lease under the St.
of 1880, for fifty-five years, by which the holders of preferred stock were to

receive semiannually an amount by way of dividend equal to the interest on the debt extinguished, as a fixed charge entitled to priority under the lease. *Held,* on a bill in equity to restrain the execution of the lease, that the holders of preferred shares of stock were to be treated as stockholders, and not as creditors; that the provision in the lease affected injuriously the rights of holders of certificates of indebtedness; and that an injunction must issue.

BILL IN EQUITY, filed May 1, 1883, by one of three trustees, to whom the Eastern Railroad Company had executed a mortgage of its railroad and other property, in pursuance of the St. of 1876, *c.* 236, to secure certain certificates of indebtedness to be issued to the creditors of the company, against the company and the other trustees, to restrain the company from executing a lease of its railroad and other property, for the term of fifty-five years, to the Boston and Maine Railroad, subject to the mortgage.

The court ordered notice by publication to the holders of the certificates of indebtedness, and, in pursuance of such notice, the Provident Institution for Savings, a corporation holding certificates to the amount of $265,000, appeared and filed an answer, stating that it was of opinion that the proposed lease would probably be promotive of the interests of the Eastern Railroad Company, and submitted its rights to the court. Holders of other certificates, to the amount of £609,400, and $1,093,500, also appeared and filed answers, admitting the facts alleged in the bill, and submitted their rights to the court.

The defendant corporation and the two trustees demurred to the bill for want of equity. The case was heard by *Field*, J., on the bill and demurrers, and reserved for the consideration of the full court; and appears in the opinion.

*R. Olney,* for the Eastern Railroad Company.

*C. A. Welch,* for the defendant trustees.

*W. G. Russell & G. Putnam,* for the plaintiff.

C. ALLEN, J. The plaintiff contends, in the first place, that, though a lease is in terms authorized by St. 1880, *c.* 205, the execution of the proposed lease should be restrained, on the general ground that the virtual union of the two railroad companies in the manner contemplated is inconsistent with the mortgage, and with the St. of 1876, *c.* 236, by which the mortgage was authorized. The argument is, in substance, that under the mortgage and statute the net earnings of the Eastern Railroad Company

are to be ascertained in a carefully specified manner, which must be substantially followed; that under the proposed lease there can be no such ascertainment of the net earnings; and that, if ascertainable, they are not to be paid over to the sinking-fund, but are to be mingled with the earnings of the Boston and Maine Railroad, and to be devoted with such earnings to various purposes; that is to say, that the earnings of the two roads and also their operating expenses and certain other disbursements are to be blended, so that the scheme of the mortgage and of the statute is departed from, and something else substituted which is not identical or substantially equivalent. The provision of the mortgage upon which this argument rests is, that the corporation may and shall apply "the net earnings of said property in the manner provided in the thirteenth and fourteenth sections of said act, and shall make therefrom the payments therein provided to the sinking-fund therein established." The fourteenth section of the act provides that "all the annual net earnings of said road as therein defined [i. e. as defined in the thirteenth section] shall be paid into a sinking-fund, to be held by said trustees for the redemption or purchase of the certificates of indebtedness issued under said mortgage," according to further provisions, not necessary at this moment to be repeated. The thirteenth section provides that during the term of six years from and after September 1, 1876, the corporation may, with the assent of the trustees, "apply to the satisfaction and discharge of such liens, mortgages, or other incumbrances, any portion of its net earnings over and above its operating expenses, including therein its necessary expenditures for construction, insurance, taxes, renewals and repairs needful to maintain its road and equipment in good condition, and its rentals, interest on certificates of indebtedness, and such payments as shall be required under its liabilities as determined under the ninth section of this act." The argument is, that this requirement upon the corporation to apply its net earnings can only be satisfied by ascertaining the net earnings in the manner, or substantially in the manner, defined in the thirteenth section of the act; and it becomes a question to be determined whether such was the intention of the Legislature, and of the parties to the mortgage, as expressed by its terms.

It is to be borne in mind that the language to be construed is the language of a legislative act. The Eastern Railroad Company was insolvent. The Legislature was authorizing it to execute to trustees a mortgage upon its franchise and property, for the purpose of securing certificates of indebtedness which were to be issued to its creditors, payable thirty years from date. If the plaintiff's construction is the true one, the Legislature was cutting itself off from the power of passing any enactment thereafter, within thirty years, in regard to the operation of the Eastern Railroad which would interfere with ascertaining its net earnings substantially in that mannner. It would prevent the corporation from giving a lease of its own road, or taking a lease of another; certainly, unless with articles carefully providing for a separate ascertainment of its net earnings. Prior legislation had recognized the possible advantages which might arise from a lease of one railroad to another, and had authorized such leases by a general law applicable to all railroads alike, except in the case of railroads each of which had a terminus in Boston. St. 1874, *c.* 372, § 170. Under this existing statute, the Eastern Railroad might have been leased to any company whose railroad had no terminus in Boston ; but special legislative sanction would have been required for the lease now proposed to be made. There is nothing in the statute authorizing the mortgage which declares in express terms that no such lease shall be given during the continuance of the mortgage, or that no succeeding Legislature shall have power to authorize such lease. And there is a certain antecedent improbability that the Legislature would intend by implication to make so stringent a provision for the method in which the property should be managed, and to cut itself off from the power to sanction any such modification as the public convenience or the advantage of the creditors themselves might be found to require. Cases might be imagined where, by reason of competition, or of accidents, robbery, or other untoward circumstances, a change in the method of operating or managing the road might be vital to its success, if not to its existence. By combination, expenses might be cut off, competition avoided, and business promoted. There is certainly no antecedent reason to think the Legislature would mean to prevent such an advantageous combination, or a

lease clearly favorable, if sanctioned alike by the Legislature itself and by those entrusted with the management of the property on behalf of the creditors, and if open to no valid objection which could be taken advantage of in a court of equity to prevent the execution of a lease which the court could see to be detrimental to the interests of creditors. It is natural that the framers of a statute should be less careful and minute in providing in express terms and in detail for possible contingencies, than parties to an important contract usually are. A construction is not to be favored which would have the effect to cut off the Legislature from the exercise of its usual powers, or to put the operation of a particular railroad beyond the reach of ordinary legislation. *Opinion of Justices*, 9 Cush. 604, 611, 612.

It is important, also, to consider the purposes for which the act was passed. The company being insolvent, the general object was to devise a scheme by which the creditors should be primarily secured, without cutting off the stockholders from the ultimate enjoyment of whatever value there might be in the property of the company, after satisfying the creditors; a scheme which would be accepted by both of these classes of persons interested in the property. To this end it was provided that the creditors should have the right to elect two thirds of the directors who were to manage the property and apply the net earnings to a sinking-fund for the extinguishment of the debt, until the whole debt should be reduced to an amount not exceeding ten millions of dollars, after which time the stockholders should be reinstated in their right to elect the whole board of directors, and, as a probable consequence, to receive dividends if the earnings should be sufficient, after paying the specified sum of $100,000 a year into the sinking-fund. The general and predominant purpose of the act was, not to define the particular manner in which a revenue should be raised from the operation of the road, but to define clearly the rights of creditors and stockholders as between themselves; and to require that, as between these two classes, all the available revenue of the road should be applied in the first place for the benefit of the creditors, by direct payment of interest, by improving the value of their security, and by setting apart a sinking-fund for the extinguishment of their debts, until the same

should be reduced to ten millions of dollars. Till then, the stockholders were to have a voice, indeed, but not a controlling voice, in the management, and were cut off from the chance of receiving any more direct benefit from the earnings than would result from the improvement of the property. As incident to this general and predominant purpose, it was also designed to allow a reasonable liberty to the directors, who were to be so chosen, to improve the property by making necessary expenditures, not only for renewals and repairs needful to maintain the road and equipment in good condition, but also for construction. It was not intended to leave it within the power of a small minority of creditors to prevent proper and reasonable improvements of the property for the convenience of the public and the development of business. The provision enumerating what items of disbursements might be made, and included in the operating expenses, appears to have been intended to give to the directors greater powers than they otherwise would have had. They were bound to apply the net earnings to a sinking-fund. But as the securities were to continue for thirty years, it is added that the net earnings so to be applied are the net earnings over and above the operating expenses, including therein certain items which might not otherwise fall within that designation. The object was, to provide that not only the operating expenses as ordinarily understood should be deducted before it should be necessary to pay the earnings into the sinking-fund, but also that certain other disbursements might be made and deducted, which might not otherwise have been deemed to be operating expenses. The definition was inserted for the purpose of extending, and not of limiting, the power of those who were to manage the road. It was not inserted with a view to prescribe to the creditors or directors a particular method in which that management must be conducted, or to require that the road should only be operated directly by the company itself, or by the directors chosen as provided in the act. The manner of operating the road, whether directly by the officers of the corporation, or by lease or otherwise, with a view to securing the greatest amount of revenue, was not what the Legislature had in mind. The words used, to be sure, when taken by themselves, are such as may naturally be considered

to show that a continuance of the method of operating the road then in use was most prominently in view. The road was then operated by the company itself. No express provision in the act looks to any change in this manner of operating it, except that a change is made in the manner of choosing the directors. But no express provision declares that no change shall be made. If the language of the act is peculiarly applicable to the operation of the road by the company itself, it is reasonable to suppose that this is so because no scheme for any change of method was then on foot or thought of. If the Legislature had meant to enact that for thirty years there should be no such change, and that during all that period, and under all circumstances, the road should be operated by the company itself, it is only natural to suppose that they would say so in plain terms. It is not to be lightly inferred that the Legislature intended to provide that during all this time the best and only permissible way of operating the road should be as an independent line, without giving or taking leases, or forming arrangements or alliances which would to some extent blend its individuality with that of one or more other railroad companies. We should be slow to construe a statute in such a manner as, by an inference of a meaning not clearly expressed, to cut off its managers from the power of so using it, with legislative sanction, as to make it most advantageous to the parties interested in it, and especially to deprive the Legislature itself of the power in the future to give such directions in reference to its management as the public good might require. The act under consideration was not passed with any such intention, but *alio intuitu*.

The language of a statute ought not to be so construed as to give it a meaning foreign to the intention of the Legislature, unless such construction is plainly required by the words used. Such is not the case here. The meaning of " net earnings " is not limited to earnings in any one particular mode, but is broad enough to include the revenue to be derived from the property in any manner. The word " earnings " is not only properly applicable to the reward or compensation of personal services, or to the revenue derived from personal services in conjunction with the use of property, but it is also used in a commercial sense, to describe the income or revenue from property itself. Money is

sometimes said to earn the interest which is paid for the use of it. The meaning in any particular case is to be gathered largely from the context. The phrase " net earnings " as used in this act is substantially synonymous with " net income " or " net profits," and all the sums received by the lessee under the lease must be applied according to the requirements of the act. If these words had stood alone, it would, we think, hardly have been contended that they would imply that the railroad must necessarily be operated by the company itself, and in no other mode. But it is strongly insisted that, when taken in connection with the additional words providing what deductions may be made, they do necessarily carry that implication. No doubt the language contemplates that method of operating the road, and is peculiarly applicable to it. But looking at the whole act, and construing it in the light of the circumstances which then existed, as disclosed therein, we do not think that this is the only construction of which the language is susceptible, or that it is the construction which was intended by the Legislature. In this aspect, the statute means all the net earnings or income of the road, over and above all necessary disbursements. The operating expenses and other items of disbursements enumerated in § 13 might be deducted if such disbursements were made. It was not intended that such disbursements must be made, but that they might be made. If operating expenses were incurred, they were to be deducted of course. So, also, necessary expenditures for construction might be deducted, meaning such necessary expenditures as might be made. So also with the other items. It was not, however, intended to enact that the road should be so managed that there should necessarily be these items of expenditure. There is no implied requirement that the corporation shall itself, by its own direct agencies, carry on the mortgaged property; but whatever is the net amount realized from the property will be its net earnings. The great and controlling purpose of the statute was to secure the proper application of all that could in any form be realized; not to prescribe the manner in which the amount should be realized.

Perhaps this view of the case will not be made more plain by illustrations; but if a mortgage were to be given by an individual,

for a long term of years, upon a farm, a mill, a wharf, or a hotel, with a provision for the application of the net earnings, over and above the necessary expenses of carrying on the property, to the reduction of the mortgage debt, it would hardly be inferred that the mortgagor intended to bind himself for the full term to carry on the property personally or by agents, and to preclude himself from letting it to tenants. Illustrations or analogies of this kind have elements of difference which should prevent too rigid an application of them. In the case before us, we are construing, not merely the mortgage, but primarily and mainly the legislative act upon which the mortgage was founded; and, for the reasons stated, we are of opinion that it was not intended to prescribe or limit the method of operating the railroad, or to prevent the execution of a favorable and otherwise unexceptionable lease, under legislative sanction to be thereafter given, by which the receipts and disbursements incident to the operation of the railroad should be blended with those of another company.

Some confirmation of this view is to be derived from the recent English case of *Doherty* v. *Allman*, 3 App. Cas. 709, where two leases were granted of land with buildings on them for 999 and 988 years respectively, with covenants by the lessee to "preserve, uphold, support, maintain, and keep the demised premises, and all improvements made and to be made thereon, in good and sufficient order, repair, and condition; and at the end or sooner determination of the said demise, so to leave and yield up the same to" the lessor, his heirs, etc. The premises had been used as corn stores for some years, and afterwards as artillery barracks, and dwellings for married soldiers. They had fallen into disrepair; it became necessary to repair them; the lessee thought it would be beneficial to convert the store buildings into dwelling-houses, which would much increase their value, and was proceeding to convert them accordingly, when the lessor filed a bill to restrain him; but it was held that an injunction was properly refused, and that, under all the circumstances of the case, such a change was not a violation of the covenants of the lease.

We are thus brought to the consideration of the further question, whether there is anything in the details of the provisions

of the proposed lease which is inconsistent with the letter or the spirit of the St. of 1876, or so unfavorable to any of the creditors that the execution of the lease ought to be enjoined. Upon this bill the general question is hardly open, whether in its result this lease, if carried into effect, is likely in the end to prove favorable or unfavorable to the creditors. There is no direct charge in the bill that it is likely to prove an unfavorable lease. Certainly no inference to that effect can be drawn, either from the position of the parties before us, or from looking into the terms of the lease, in view of such circumstances as have been brought to our attention. The bill to restrain the lease is brought by one of the three trustees who together represent the creditors. The bill alleges that the other two trustees, who have a like interest and duty with the plaintiff, refused to join therein as plaintiffs. The individual creditors who appear, representing together nearly one third of the whole amount of the debt secured by the mortgage, make no objection to the lease, and one of them, the Provident Institution for Savings, by its answer virtually declares itself to be in favor of it. Nobody appears to maintain the contrary, except the single trustee who brings the bill, and he rests his claim not so much on the ground that the lease would be generally and on the whole unfavorable, as that it is unauthorized, and therefore illegal. At the time when the St. of 1876 authorizing the mortgage was passed, it appears to have been considered by no means certain that the net earnings of the Eastern Railroad Company would be sufficient to pay the full amount of interest upon the indebtedness of the company. The interest upon the entire debt was accordingly reduced for six years, after which it was to be at the rate of six per cent per annum. The company, as has been said, and as is stated by the plaintiff in the argument, was then insolvent. Its line was a competing one, to some extent, with the Boston and Maine Railroad, which was then and has since been a strong and dividend-paying company. In the proposed lease, there is an absolute promise on the part of the latter company that it will apply the whole of the gross earnings of both roads to the enumerated purposes connected with the operation and improvement of the properties, and to the payment of interest on the permanent debt of both companies, prior

to the payment of any dividends to its own stockholders, not only during the continuance of the mortgage, but that for fifty-five years it will in like manner apply the same to the payment of any portion of the permanent indebtedness of the Eastern Railroad Company that shall be renewed or extended, or, if any portion is paid, then it will during that period pay to the Eastern Railroad Company a sum equal to the interest thereupon. The Boston and Maine Railroad does not agree to see to the payment of the principal at the end of the fifty-five years, but it does what may well be considered as far more important; namely, it agrees to apply the whole combined earnings of both roads for that period to the payment of the interest at the rate of six per cent per annum, in priority to any dividends to its own stockholders. The sum of $1,250,000, if now put and kept at interest at the rate of four and one half per cent per annum would yield enough to pay the whole principal of the debt at the end of that time. The chief present value of the certificates of indebtedness consists in the interest, and is covered by the agreement of the Boston and Maine Railroad in respect to the payment of the interest. Looking at it generally, therefore, we see no reason to conclude, from anything which has been brought to our attention, that the proposed lease, in its general features and provisions, would probably be an unfavorable one to the creditors; and we dismiss that aspect of the case as one upon which there is no occasion to grant an injunction.

But the chief reliance of the plaintiff, in this part of the case, is put upon three propositions; namely, that the terms of the lease are inconsistent with the obligations imposed upon the corporation by the act and mortgage, because, — 1. The lease provides for the payment, out of net earnings, of interest on improvement bonds representing expenditures for construction on both roads, and of a sinking-fund to absorb these improvement bonds, which is also to be paid in annual instalments out of the net earnings of the lessee from the combined system; or, in other words, the net earnings which are pledged to the mortgage sinking-fund are to be partly applied to a new sinking-fund to protect junior securities. 2. The property which the Eastern Railroad Company had the power to sell, and the proceeds of which, if sold, were to go to the sinking-fund, passes wholly out of the control

of the lessor into that of the lessee, which has not the same interest in reducing the principal of the lessor's debt, and cannot be expected to sell any of the leased property for that purpose. 3. The lease provides that the lessee shall pay semiannually to those bondholders who may exchange their bonds for preferred stock, under the St. of 1882, *c.* 177, an amount by way of dividend equal to and enjoying the same priority with the semi-annual interest upon the debt so extinguished.

The first two of these objections relate to the method of ascertaining the sum to be paid by the lessee for the use of the leased property. But, if the views heretofore expressed are correct, it is not easy to see how objections to the details of the provisions of the lease in this respect can be successfully urged, unless they go so far as to impugn the good faith of the transaction, or to show that on the whole the lease is an unfavorable one to the creditors. It might have been provided that a gross sum should be absolutely payable annually, without regard to the result of the operation of the road. If such a sum had been fixed, which would be sufficient to pay the interest, with something more for the sinking-fund, and if the lessee had also covenanted to keep the property in good condition, with necessary repairs and renewals, we do not see how the objection could be supported, that the method and scheme of the lease would be inconsistent with the obligations imposed upon the Eastern Railroad Company by the act and mortgage. The receipts under such a lease would still be net earnings, to be applied according to the requirements of the act. In other words, net earnings may be ascertained by contract, as well as by the actual and direct operation of the road by the company itself. Looking, however, at each of the two special objections to the mode of ascertaining the sum to be paid by the lessee by itself, in the light of the averments of the bill and the grounds upon which it rests, we do not see any such departure from the plan of expenditure contemplated by the mortgage as to call for the issue of an injunction against the execution of the lease.

In the first place, § 13 of the statute defines the operating expenses to include " necessary expenditures for construction, insurance, taxes, renewals and repairs needful to maintain its road and equipment in good condition," as well as certain

other items not necessary to be mentioned here. We understand the words "needful to maintain its road and equipment in good condition" to relate to and qualify the words immediately preceding, namely, "renewals and repairs," and not to reach back so as to qualify the "necessary expenditures for construction." This qualification would have no natural or apt relation to the intervening items of insurance and taxes. It follows, that under the mortgage it was permissible to make necessary expenditures for construction, before, paying any portion of the earnings into the sinking-fund. This, indeed, is conceded by the plaintiff. Under the lease, the lessee is to make from time to time such permanent improvements in and upon the demised premises as the requirements of business may make necessary and proper. To meet the cost of them, and of the like improvements upon its own property, the lessee, if there are not sufficient surplus earnings after making all enumerated payments, is to issue its own bonds, to be called improvement bonds, keeping separate, however, the bonds so issued for improvements on the Eastern Railroad, and the interest upon all such bonds issued for improvements on both roads, with one and one half per cent for a sinking-fund, is to be paid from the combined earnings as an operating expense; and, in case of the determination of the lease, such bonds issued for improvements on the Eastern Railroad as may be outstanding are to be assumed by that company, but as a debt postponed to the mortgage and to the certificates of indebtedness secured thereby. Any such improvements, therefore, enure to the benefit, by way of increased security, of the present creditors, in the event of a determination of the lease before the improvement bonds have been paid. We do not see that the payments meanwhile for interest and sinking-fund will be likely to exceed what the Eastern Railroad Company might have expended for construction under the terms of the mortgage; it being assumed, as must be assumed, since otherwise the interposition of a court of equity might at any time be invoked, that good faith and reasonable care will be exercised by the lessee in determining upon such necessary and proper improvements.

The next specific objection, namely, that the property which the Eastern Railroad Company had power to sell will under the

lease be diverted from the sinking-fund, is unavailing also, because under § 13 of the act the creditors or their trustees have no right to require the corporation to sell any property for the purpose of applying the proceeds as therein provided.   The corporation is authorized, but is not bound, to make such sales. The inclusion of such property in the lease furnishes of itself no ground of complaint, there being no charge of a want of good faith.

The final objection, founded on the provision for the payment of dividends upon preferred stock, in case such should be issued, rests upon a different ground, and raises the question whether this provision looks to a substantial misapplication of the net earnings, when ascertained, or other substantial injury to the creditors.   Article 5 of the lease provides that "the lessee shall pay upon the preferred stock of the lessor, when issued under *c.* 127 of the acts of the Legislature of Massachusetts for the year 1882, semiannually, at the same times as the interest on the debt-extinguished by said preferred stock would have been payable, in lieu of said interest and as a fixed charge entitled to the like priority under this lease, an amount by way of dividend equal to the semiannual interest upon the debt so extinguished."

It is certainly open to question whether, by the true construction of this, provision, the payment of the sum thus stipulated for is to be made directly to the preferred stockholders, or to the lessor, to be by the lessor disposed of according to law.   But we think that in either view this provision of the lease ought not to be allowed to stand.

If the payment is to be made directly to the preferred stockholders, it is to go *pari passu* with the payment of the interest on the debt, and if there is not enough to pay both in full, both must abate in like proportion.   To the lessee it is not very material to whom the money is to be paid, so long as the amount to be paid remains the same.   No more is to be paid by way of dividend than would be required for the interest if no certificates of indebtedness were exchanged for preferred stock.   But creditors have a different interest, and certain provisions in the St. of 1876, already referred to, looking to the ultimate security of the holders of the certificates of indebtedness must be more

particularly considered. By § 11 of that statute, the holders of the certificates are to choose six directors, being two thirds of the whole board; and whenever the indebtedness is reduced to $10,000,000, their power to choose directors is to cease. By § 14, all the annual net earnings are to be paid into a sinking-fund, to be held by the trustees for the redemption or purchase of the certificates of indebtedness, until the indebtedness is reduced to $10,000,000, or until a sum sufficient so to reduce the same is so paid in; and thereafter $100,000 a year is to be paid in, if the net earnings suffice therefor. By force of these two provisions, the creditors are to have control of the road, and all the net earnings are to go into a sinking-fund for the benefit of the creditors, ·until the indebtedness is reduced to $10,000,000. These provisions look to a *bona fide* extinguishment of indebtedness to that amount, and not to a substitution of something which shall have most of the essential characteristics of a debt, though under another name.

By the St. of 1882, *c.* 177, the Eastern Railroad Company is authorized to increase its capital stock, by issuing preferred stock to an amount of not more than $5,000,000; and is required to issue such preferred stock, in exchange for certificates of indebtedness, to any amount not exceeding that sum, upon the tender thereof. Such certificates when received are to be cancelled. The holders of such preferred stock are to receive dividends, out of the net earnings, not exceeding six dollars per share, to be paid in semiannual instalments, in such sums as the directors may determine. But nothing contained in this act is to prevent the full operation of all the provisions of the St. of 1876, *c.* 236, or defeat or in any wise affect any of the terms or conditions of the certificates of indebtedness and mortgage, made under and in pursuance of said chapter, or to authorize any payments from the earnings of said corporation, except subject to all claims and charges upon said earnings created by said chapter, and by said certificates and mortgage. It was thus intended to preserve all rights of creditors, according to the true construction of the St. of 1876. If preferred stock should be issued in exchange for certificates of indebtedness, the holders of such preferred stock would hold it merely as stockholders, and in subordination to the claims of the residue of the holders

of the certificates of indebtedness. The mortgage would still continue to be a first lien upon all the net earnings of the road for the payment of the interest due to the remaining creditors, in priority to any payment of dividends to the holders of preferred stock. But by the terms of the proposed lease this condition of things is not maintained. So far as the right to receive six per cent a year is concerned, the holders of preferred stock would for fifty-five years under the lease occupy the same position as creditors; and the holders of the remaining certificates of indebtedness would not, to this extent, hold them in priority to the preferred stockholders, and the mortgage would not continue to be a first lien upon all the net earnings for the payment exclusively of the interest due to the creditors. Under the St. of 1882, the holders of preferred stock must be classed as stockholders for the purpose of depriving the remaining holders of certificates of indebtedness of the power to choose six directors, and of discontinuing the necessity of paying the whole of the net earnings into the sinking-fund; and they ought to remain stockholders to all intents and purposes, so far as the interests of the creditors are concerned. But, under the lease, they would still be in the position of creditors; for the purpose of sharing in the equal distribution of the earnings. This is a substantial injury to the rights of the remaining creditors, as secured by the St. of 1876. As has already been shown, the rent or sum to be paid by the lessee is to be considered as the net earnings of the road. Each creditor has a right to insist that the creditors shall receive the benefit of the whole of it, in the manner provided for in that statute, until the indebtedness is actually, and in good faith, and to all intents and purposes, reduced to an amount not exceeding $10,000,000. This result is not accomplished by issuing preferred stock, with provisions making the holders of it to be substantially the same as creditors.

If, on the other hand, the payment of the sum stipulated for in article 5 of the lease is to be made to the lessor, it may be and probably is true that it would be within the jurisdiction of a court of equity to compel the lessor to dispose of the money according to law, upon proper proceedings hereafter to be instituted for that purpose, and thus to prevent any misappropriation

thereof by paying dividends to the preferred stockholders so long as a different disposition might be required by the terms of the St. of 1876. It may well be considered that the money would come into the hands of the lessor clothed with the trust created by that statute in behalf of the creditors, to which the rights of the preferred stockholders would be subordinated, notwithstanding the terms of the lease to the contrary. But a lease which contains provisions contemplating such a breach of this trust ought not to receive the sanction of the court. Article 5 of the lease does plainly contemplate an unlawful disposition of the net earnings of the road, by a premature payment of dividends to preferred stockholders, which would amount to such a breach of trust.

In either view of article 5 of the lease, and because of that article only, the entry must be          *Demurrer overruled.*