In re UNITED RAILWAYS & ELECTRIC CO. OF BALTIMORE'S REORGANIZATION.

No. 8204.

District Court, D. Maryland.

June 14, 1935.

July 18, 1935.

Venable, Baetjer & Howard, of Baltimore, Md. (by Edwin G. Baetjer and Harry N. Baetjer, both of Baltimore, Md.), on behalf of committee of first lien bondholders protective agreement.

Charles McHenry Howard, of Baltimore, Md., in behalf of the trustees of United Railways & Electric Co.

Henry H. Waters and Joseph C. France, both of Baltimore, Md., on behalf of the United Railways & Electric Co.

Lauchheimer & Lauchheimer, of Baltimore, Md. (by Sylvan H. Lauchheimer, of Baltimore, Md.), and Semmes, Bowen & Semmes, of Baltimore, Md., on behalf of the income bondholders protective committee.

Emory, Beeuwkes, Skeen & Oppenheimer, of Baltimore, Md. (by Reuben Oppenheimer, of Baltimore, Md.), for committee of John D. Howard, Abel A. Rosenberg, Donald H. Sherwood, and George M. Kimberly, under authority of the 5 per cent. thirty year funding bondholders protective agreement, dated January 31, 1933.

Edward Duffy, of Baltimore, Md., for the Continental Trust Co.

Isidore Ginsberg, of Baltimore, Md., for Hyman Ginsberg, administrator in a case pending against the United Railways & Electric Co.

Harry Albert Reichel, of Annapolis, Md., dissenting stockholder, in pro. per.

WILLIAM C. COLEMAN, District Judge.

The court has given very careful consideration to the details of the plan as submitted by the bondholders' committees for reorganization of the United Railways pursuant to section 77B of the Bankruptcy Act (11 USCA § 207), relating to corporate reorganizations. Lengthy hearings have been held after due notice to all bondholders, creditors of all classes, and all stockholders; in short, to all interested parties, to whom, at these hearings, full opportunity was afforded to object to the plan or any part of it, and to be heard fully.

To such objections as were presented, which were very few, the court has giv-

en all due consideration but has reached the conclusion that the plan as presented is fair and equitable. It does not discriminate unfairly in favor of any class of creditors or any class of stockholders. It is feasible and will, under all of the existing circumstances, afford a very satisfactory method for reducing the excessive capitalization of the company and for rehabilitating the system, to the end that the net revenue of the company may be increased, and the new securities of the company, to be issued under the plan of reorganization, may have the value and yield the return that is contemplated, along with which must, of course, come benefit to the general public by improvement in the entire transportation system of the company.

Approval of the plan has been recommended by Mr. Charles W. Chase, president of the Indianapolis Street Railway Company, whom the court selected, after very careful investigation several months ago, to advise and assist the court in the role of special master, in connection with the reorganization. The trustees (formerly the receivers), Messrs. Lucius S. Storrs and William H. Meese, appointed by the court to operate the property pending its reorganization, have also approved the plan. Furthermore, the plan has been approved by approximately 98 per cent. of every class of bondholders, and by more than two-thirds of all other creditors and stockholders, which is highly significant of its fairness, although the court would not approve of any plan, regardless of the extent of assents thereto, unless the court felt that such plan formed the best available basis for actual and not merely theoretical rehabilitation of the company, within a reasonable period of time.

The question as to who shall control and manage the affairs of the company upon reorganization is, of course, of prime importance. The plan provides that for ten years the control shall be vested in voting trustees, with a provision, however, for the right of the preferred stockholders to terminate the voting trust agreement at any time after five years, and for the right, at any time during the life of the voting trust agreement, for the preferred stockholders to substitute any person or persons for any trustees thereunder. But to accomplish either of these things, approval by more than 80 per cent. of the preferred stockholders will be nec-

essary. The court has made it a condition of its approval of the plan that the voting trustees (whose duty it will be to elect the new board of directors and who themselves will be eligible for such board) shall be "new" in fact; shall be fairly representative both in type and number of all classes of security holders and of the public's interests, and, therefore, shall be drawn from different groups in the industrial life of the city, competent and disposed to insure highly efficient, economical, and, at the same time, progressive administration of the company's affairs.

Mr. Chase, as special master, has not yet completed the survey of the system in which he has been engaged for several months under the court's direction. Therefore, until such has been completed and his report filed with the court, and until the court has had an opportunity to study it carefully, as well as the recommendations that will doubtless accompany the report, the court prefers to postpone rendering its complete opinion. In such opinion, the court intends to deal more specifically than is now done with the reasons why it believes the plan should be approved and will there review in detail various measures which it shall recommend looking towards greater economies and improvements in the service now rendered by the company, which, of course, are considerations of paramount importance and which must be faced along with the adoption of any financial plan. Obviously, no financial reorganization of the present street railway system can be more than a "paper" reorganization if rehabilitation of the company's properties and service is not also carefully planned and carried out as speedily as is practicable in order to keep pace with the radical changes that have occurred, and are still likely to occur, in modes of transportation. Since, however, it is important that the reorganization be progressed with as little delay as possible, a decree has this day been signed approving the plan and, as above explained, this short opinion will, in due course, be followed by a more complete and detailed one.

### Additional Opinion.

This court, on the 14th day of June, 1935, approved the plan of reorganization of the United Railways & Electric Company of Baltimore, and at the same time filed a short opinion summarizing

the court's reasons for so doing. The court further stated that it would later file a more detailed opinion dealing (1) with the court's reasons for approving the plan, and (2) with the report of the special master who had been employed to make a complete survey of the entire physical properties of the company and its affiliates, and whose report had not then been filed.

Certain minor changes in the plan, which do not, however, adversely affect any of the interests involved, became necessary. These have been approved after due notice and opportunity to be heard, so that there has now been final approval of the plan of reorganization to which approximately 98 per cent. of all bondholders, 68 per cent. of all unsecured creditors and 75 per cent. of stockholders have assented; in every instance more than the legal requirements.

The purpose of the special master's survey was to ascertain and to recommend in what ways and at what cost the present service may or should be improved, coincident with increased earnings, both with respect to the immediate future, and also with respect to a period of five years; the survey to include a detailed study of the transportation problems involved in these properties. The court further stated that, obviously, no financial reorganization of the present street railway system could be more than a "paper" reorganization if rehabilitation of the company's properties and service is not also carefully planned and carried out as speedily as is practicable, in order to keep pace with the radical changes that have occurred, and are still likely to occur, in modes of transportation.

## Part 1.

With respect to the court's reasons for approving the plan, the primary reasons may be summarized as follows: First, the company's funded debt has been reduced to an amount which bears a proper relation to the true value of the property. Second, the total securities to be issued under the reorganization represent an actual cash investment in the company's properties in excess of the new capitalization. Third, the company is burdened with no fixed charges beyond its actual capacity for paying them, because none of the new securities, except a small amount hereinafter referred to, bear interest or dividends, except if and to the

extent earned. Thus the requirement of the Baltimore City ordinances, imposed upon the company that by September 1, 1935, its annual fixed charges shall not exceed $2,000,000, if the company is to have the benefit of the reduction of the gross receipts (park) tax to 3 per cent., has been completely met. Fourth, the distribution of the new securities reflects, with reasonable accuracy, all of the respective existing rights of the present security holders, and does not discriminate unfairly against any class of such holders. Fifth, all unsecured creditors are fairly treated with respect to liquidation of their claims. Sixth, the voting control, and thereby the management, of the company has been taken out of the hands of the old common stockholders, whose administration of the company's affairs has not, in a number of respects, commended itself to the court, as the court has pointed out on previous occasions during the receivership proceedings, and, through a voting trust, has been placed in the hands of those rightly entitled to control and manage the company, i. e., the holders of the new debentures, who stand in the shoes of the old first lien bondholders; the holders of the old junior securities being, however, themselves afforded some representation in the management of the company, as hereinafter referred to.

Enlarging somewhat upon the above points in the order named, the court is satisfied that the new total capitalization of the company, which is slightly less than $50,000,000 as against $85,000,000 old capitalization, is based upon an accurate estimate of the value of the company's assets. It should be pointed out that, on the old basis, the company had the highest funded debt of any street railway in the United States in proportion to miles of track, population served, and gross revenue; to wit, $164,250 per mile of single track, as against an average of $50,585 on 21 of the largest street railway systems in the country.

The testimony adduced at the hearings shows that there were three accurate bases for arriving at a proper physical valuation of the company's property: First, the valuation adopted by the Public Service Commission of Maryland, which, as a result of fairly recent appeals to the Court of Appeals of Maryland and thence to the Supreme Court of the United States, has received the

approval of those tribunals; second, the valuation of the company itself, which had been most carefully prepared after diligent studies over a period of two or more years; and, third, the earnings of the company. The new capitalization bears very proper relation to all three of these bases. In 1928, as the result of rate litigation, the value of the company's property, after depreciation, was fixed at $75,000,000 by the Public Service Commission of Maryland, which value was subsequently accepted not only by the company, but by both the Court of Appeals of Maryland, and by the Supreme Court of the United States. See United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390; also, Public Service Commission v. United Railways & Electric Co., 155 Md. 572, 142 A. 870; United Railways & Electric Co. v. Public Service Commission, 157 Md. 70, 145 A. 340. It is on this valuation with figures adjusted to December 31, 1934, showing a valuation of road and equipment of $65,283,120 (not including easements and going value), together with current assets of $2,000,000, that the present reorganization plan is predicated.

With respect to earnings as a basis for determining the true value, the company's earnings, available for fixed charges, other interest and dividends, in 1931 were $2,300,000, and, on the belief, which seems to be a rational one, that the company's earnings would, following the depression, be restored to the 1931 level, this figure was used as a fair index.

In view of what has just been said, it is unnecessary to go into a further analysis of the fact that the new securities represent an actual cash investment in the property, in excess of the new capitalization.

Next, the rehabilitation of the company should be vastly facilitated by that feature of the plan which is perhaps the most noteworthy, namely, the reorganization begins with no annual fixed charges whatsoever upon the property except the sum of $46,550, being interest on $931,-000 of 5 per cent. debentures, as hereinafter more specifically referred to; all other interest charges being payable only when and to the extent earned. This leaves the credit of the company under the reorganization in the best possible condition for future borrowing, as and when the same may be necessary.

Next, with respect to the distribution of the various new securities, this was, of course, not an easy task to perform in order to satisfy all concerned, but the court believes it has been done in a very fair way, with results that are nondiscriminatory against any class of holders of the old securities. There had been outstanding for many years 12 issues of securities, constituting the capitalization of the company. Of these, five were divisional bonds, and two were Maryland Electric Company bonds, which were substantially divisional bonds. Each one of these divisional bonds covered a railway which was originally an independent unit, a self-contained railway, but through the later consolidations this independent character was completely destroyed. The identity of the respective assets of each railway became lost and, therefore, it became absolutely essential to disregard the various divisions in the present reorganization, in so far as different securities were concerned, and simply to proportion, as nearly as possible, the actual values that now adhere to the respective parts, as represented by the old securities. Thus, under the reorganization, nine different mortgages with their respective securities have been supplanted by the issue of (1) debentures and (2) preferred stock. The junior bonds and stock, which before reorganization consisted of three issues, income bonds, funding bonds, and common stock, are now to be represented solely by common stock. In other words, all of the old twelve various securities are now represented merely by (1) debentures; (2) preferred stock; and (3) common stock. The reasons for the differences in the various allotments to the different classes of holders of the old securities are, the court believes, sound, and are sufficiently well summarized in the statement which was issued by the bondholders' protective committee. Therefore, the court deems it sufficient to quote the following from this statement:

"Capitalization of Present and Reorganized Companies:

"The existing capitalization is as follows:

| | |
|---|---|
| Total First Lien Bonds | $46,426,000 |
| Funding and Income Bonds | 17,920,000 |
| Total Bonds | $64,346,000 |
| Common Stock, 409,224 shares, par value | 20,807,000 |
| | $85,153,000 |

The new capitalization will be substantially as follows:

First 4% and 5% Debentures.............. $23,086,600
First 5% Preferred Stock.................. 23,339,400

$46,426,000

Common Stock, 170,000 shares of no par value, or such nominal or par value as the Committee may fix

"The First 4% and 5% Debentures will bear interest if and to the extent earned, except as to $931,000 (issued for Maryland Electric Railway Company First Mortgage 5% Bonds), which will bear interest unconditionally. The interest is cumulative except that for the first year it shall be cumulative only to the extent of 50% and for the second year to the extent of 75%; thereafter it is fully cumulative. Subject to the stated differences as to interest, the rights and priorities of the 4% and 5% Debentures shall be the same.

"First preferred stock. The dividends on this stock shall be partially cumulative; if any instalments of dividends are not paid and thereafter there shall be surplus income for any year after providing for the current Preferred Stock dividend in full, such surplus to the extent distributed will be divided 55% to the Preferred Stockholders and 45% to the Common Stockholders, until all such arrears of interest accruing after July 1, 1937, are paid.

"The First Preferred Stock shall be entitled to one vote for each share. The Common Stock shall be entitled to one vote for each three shares. Whenever any six months instalment of dividends shall be in arrears the Preferred Stockholders shall have the sole right to vote for the election of directors. The Common Stock shall always have the right to name one director, whether or not any preferred dividend shall be in arrears.

"Distribution of new securities: To the holders of the various securities is as follows:

Underlying and divisional bonds, including the bonds of the Baltimore Traction Co.; Lake Roland Elevated Ry. Co.; Central Railway Co.; and Baltimore, Sparrows Point and Chesapeake Railway Co................. $ 6,452,100
50% in First 5% Debentures
50% in First 5% Preferred Stock
United Railways Consolidated 1st 4% and 6% Bonds................. 33,269,000
50% in First 4% Debentures
50% in First 5% Preferred Stock

The holders of the 6% Bonds will receive in addition for the two per cent. coupon, one share of Common Stock for each $1,000 Bond.
Maryland Electric Railways First Mortgage 5% Bonds................. 1,862,000
100% in First 5% Debentures, of which one-half bear interest unconditionally, but are otherwise of the same rank as the balance of the debentures.
Maryland Electric Rys. 1st and Refunding 6½% bonds................. 5,287,000
30% in First 5% Debentures
70% in First 5% Preferred Stock
Funding Bonds:
8½ shares of new common stock for each $1,000 bond.
Income Bonds:
7½ shares of new common stock for each $1,000 bond.
Common Stock:
1 share of new common stock for each 20 shares of the existing stock
Other Allotments:
Collateral Notes................. 983,000
The holders will receive a new note payable within two years from date for ................. 181,000
secured by part of the existing collateral.
For the remaining collateral consisting of $1,109,300 Maryland Electric Railways First and Refunding 6½% bonds and other First Lien bonds of the Railways Company new securities will be issued on the same basis as above provided and the old notes will be cancelled. * ⸰ *

"Reasons for the difference in allotments: The First Lien Divisional Bonds, i. e., those of the Baltimore Traction Company, Central Railway Company, Lake Roland Elevated Railway Company and the Baltimore, Sparrows Point and Chesapeake Railway Company are first. liens on the property of the former constituent companies and have no lien on the other property of the system. They carry coupons for interest at 5%, except the Baltimore, Sparrows Point & Chesapeake Railway Company bonds which bear interest at 4 1/2%, but with a state and city tax refund provisions amounting substantially to 1/2%.

"The United Railways 4% and 6% bonds are identical in lien and security; the 6% bonds are 4% bonds to which were later attached coupons for 2% additional. The assurance of the payment of the 2% arose from the fact that default involved receivership of the system, but these coupons were not secured by any lien and they are therefore treated in the plan as unsecured debts.

"First Consolidated 4% Mortgage was originally a first mortgage on only a small part of the system and a second lien sub-

ject to underlying bonds on the balance. Through later redemption of underlying liens this issue became a first lien on the greater part, approximately 270 miles, or 70% of the entire system mileage. The valuable trackage of the old City Passenger System is a part, though small part of the 270 miles on which this mortgage is a first lien. The First Consolidated 4% bonds have as to 70% of the system mileage precisely the same position and lien which the underlying bonds have in their several mileages. The allotment to the First 4% bonds was made on this basis.

"The studies of the Committee indicated that there was no marked difference between the security for these various first lien issues. A comparison between the relative physical value of the properties subject to the first liens, the number of cars and miles operated over each, the earning capacity, bonds per car mile, and other factors gave the underlying divisional bonds in the judgment of the Committee a greater value than the First Consolidated 4% and 6% bonds, and this difference was adjusted by a difference of 1% in the interest rate on the debentures allotted to these issues respectively. For the unsecured 2% coupons attached to the 6% bonds there is allotted one share of Common Stock for each $1,000 bond.

"Maryland Electric Railway Company First Mortgage 5% bonds. The security of these bonds consists of power substations, car-barns with relatively small amount of track mileage.

"The original issue of these bonds was $4,946,000. They were sold at substantially par and under the terms of the mortgage all proceeds were invested in property; since that time the sinking fund provided by the mortgage has retired the greater part of the issue leaving outstanding only $1,862,000.

"In view of the greater security of this issue, 50% in Debentures was substituted for 50% in Preferred Stock allotted to other issues and the interest on one-half of the allotment $931,000 (or $46,500.00 annually) was made unconditional.

"Maryland Electric Railways Company First and Refunding 6 1/2% Bonds. These bonds are secured by a first lien on part of the Company's property and by a second lien on the balance, including the property subject to the first lien of the First Mortgage 5% Bonds above. A part of this issue was used to supply funds for the sinking fund to retire the First 5% Mortgage Bonds and about $1,700,000 of said bonds were so retired and the second lien correspondingly improved. The receivership of the Railways however prevented further retirement and impaired the value of the second lien of this issue.

"To the extent that these bonds were secured by a first lien the allotment was made on the same basis as the other bonds. To the extent that they were secured by a second lien the allotment was made substantially in Preferred Stock.

"Funding Bonds and Income Bonds. The present earnings are far less than the interest charges having priority over these issues. The earnings for the year 1931, two years after the commencement of the depression, were sufficient for such first lien charges leaving a surplus applicable to these junior bonds. It was thought fair therefore to afford to these holders a chance to recoup their losses if business conditions and the earnings of the Company improved. As the interest charges on the new securities issued for the First Lien bonds have not been increased the new Common Stock has the same position with respect to the income as the existing Funding and Income Bonds. The fact that the prior charges of the new securities will be dependent on income and remove the danger of foreclosure for default, the postponement and the partly cumulative features of the income charges somewhat improves the existing rights of both issues. The division of the Common Stock allotment between the two issues was made in accordance with the decision of the Committees representing them.

"Common Stock. There is little even prospective value which can be assigned to the now outstanding Common Stock. The stock has been the subject of attack in the past on the ground that it was bonus stock not representing actual investment. That a large part was issued as part of the organization of the Railways Company is correct. However, some years after the organization the Company sold additional stock to the public for an aggregate of more than $2,700,000 in cash which was applied to the payment of the Company's mortgage bonds

and other capital purposes. While there is no distinction in right between the original and later issues and transfers would make a distinction impracticable, it was determined to make a small allotment—1 share of new stock for each 20 shares of old, and on this basis, every share of new common so issued will represent more than $100 paid to the Company in cash by the old stockholders."

Passing next to the question of the treatment under the plan of reorganization of unsecured creditors, the court believes that they have been fairly treated (1) by affording to prereceivership damage claims the same treatment as is accorded the first consolidated 4 per cent. bonds, namely, 50 per cent. in first 4 per cent. debentures, and 50 per cent. in first 5 per cent. preferred stock, or, at the option of the claimant, cash at the market value of such bonds of equal principal amount; and (2) by affording other unsecured debts, except to the extent that claims to priority may be judicially sustained, three-quarters of a share of common stock for every $100 of debt.

Finally, as to the control and management of the new company under the reorganization, which obviously is of most vital concern, the court believes that a much more enlightened, constructive and economical management of the company's affairs has been assured through the voting trust, which forms part of the plan.

The court has insisted that the voting trust agreement shall continue for ten years with provision, however, for the right of the preferred stockholders to terminate the agreement at any time after five years upon vote of 80 per cent. of such stockholders; or upon vote of 60 per cent. of such stockholders if concurred in by 60 per cent. of the debenture holders. In the same manner, any of the voting trustees may be changed.

With respect to the personnel of the voting trustees, the court insisted, as a condition precedent to approval of the plan, that at least a minority of the trustees (the total number of whom has been set at nine) shall be selected from a list submitted by the court. This list was prepared after the most careful weighing of all of the considerations involved in the future management of the company. It embraces, the court believes, only the names of prominent, successful business men of Baltimore City, compe-

tent in every way to guide the affairs of the new company, and to bring into the management of the company a progressive approach to the many and difficult problems that will inevitably arise, and at the same time will insure economical methods and all due regard for the interests of the owners of the property and the public as a whole.

## Part 2.

With respect to the special master's survey, the special master, Mr. Chase, has now completed and filed his report and recommendations which are the result of more than four months' intensive study by him personally and a number of assistants, all totally unconnected with the company's organization. The report covers 152 typewritten pages, and more than 50 exhibits. It is a most comprehensive piece of work, the most exhaustive survey that has ever been made of the company's properties and transportation problems. The court has given very close study to this ,report and submits it herewith, in the belief that the plan which the special master embodies in the report indicates a very feasible manner, if not indeed the most feasible manner, in which the imperative rehabilitation and modernization of the company's service can be accomplished, to the end that the plan of financial reorganization which the court has just approved may yield the contemplated return upon the new securities issued thereunder, coincident with greatly improved service to the public. Therefore, the court most seriously recommends that this plan be adopted by the new company within the time, and in the manner set forth by the special master, barring, of course, unforeseen circumstances which may require some alterations or departure from the plan in some of its details, without alteration or departure, however, from its major features and underlying purposes.

A complete detailed review of the survey is not practical in this opinion. A summary, however, of the special master's recommendations and his reasons therefor will be given.

The special master finds that while the general condition of the 366 miles of track operated by the company is substantially better than that of most street railways, nevertheless, during the last several years there has been almost no re-

placement of worn-out tracks, and that, therefore, an expenditure of approximately $3,500,000 will be required over a period of ten years to restore the tracks and roadways to standard condition; their present condition being approximately 82 per cent. of standard. The special master also finds that except for the 150 modern, lightweight, speedy, and attractive rail cars, purchased by the company in 1930, the 1,038 cars available for service are generally slow, old, and obsolete, and insufficient and incapable of offering competition to the automobile, private and public.

The special master reports that while 53 per cent. of all the cars are equipped for one-man operation, all of them should be so operated, and that the present speed schedules reflect the age and obsolescence of the equipment, and can and should be greatly improved; also, that since the various lines and their operations have suffered from the fact that they have been developed out of the consolidation of some 29 independent street railway enterprises over a long period of time, this has resulted in much useless, competitive, and parallel operation on a number of lines in the older portions of the city.

The basic feature for rehabilitation embodied in the report may be summarized as the recommendation for the adoption of the trackless trolley as a major part of the system, combining the operation of the rail car, trackless trolley car, and the gas motorbus to their respective best advantages, in general, rail car operation being more efficient and economical upon lines having heavy density of traffic; trackless trolley cars being more efficient and economical upon lines of lighter traffic density, and the motorbus being more efficient and economical upon lines where the traffic requirements are lightest, or for pioneering and feeder service. The report points out that London is now ordering 500 additional trackless trolleys; that Cleveland, San Francisco, and Providence have announced a contemplated installation of this form of equipment; that Chicago, with 114 trackless trolley cars, has at the present time the largest installation of any city in this country, and that, wherever the street car operates on paved streets, the trackless trolley car can operate even better and with almost complete quiet and decided economy in operation.

The special master recommends a comprehensive program spread over five years for the prompt rehabilitation and modernization of the company's system, involving the conversion of approximately 150 miles of track into trackless trolley operation. The system would then consist of 189 miles equivalent of rail operation, 83 miles of trackless trolley operation, and 89 miles of motorbus operation. That is to say, the trackless trolley would, under the plan, provide about 43 per cent. of the total present rail operation, leaving 10 major rail arteries.

To furnish the contemplated new service, the plan proposes the acquisition of 350 trackless trolley cars, 300 of the most modern lightweight rail cars, and 30 new motorbuses, which, with the 150 modern rail cars acquired in 1930, complete the entire equipment under the plan.

The estimated increased revenue from the proposed trackless trolley operation is 10 per cent. over the track cars based upon the company's 1933 earnings, and the estimated increased revenue from the proposed new rail cars as against the old rail cars is 5 per cent., based also on the company's 1933 earnings.

The total cost of making the conversion as above outlined, and of purchasing the new equipment is estimated to be approximately $11,920,000, consisting as follows:

| | |
|---|---|
| 350 trackless trolley cars—40 passenger capacity | $ 4,200,000 |
| Overhead trackless trolley line installation | 1,200,000 |
| 300 modern light weight rail cars | 4,800,000 |
| Rehabilitation of remaining track structure over a ten year period | 1,500,000 |
| 30 additional gas motor coaches | 220,000 |
| Aggregate cost of modernization program | $11,920,000 |

It is estimated that this outlay would be approximately $3,500,000 less than that required for a continued full rail operation program, on an equivalent modernized basis, assuming that the necessary repairs and replacements are taken care of during the same, namely, the 5-year period.

The report submits detailed figures supporting the assertion that the plan may be financed (1) from earnings on the basis of results obtained in 1933, the worst in the company's history; (2) from the use of the accrued depreciation reserves; (3) from the increased earnings and savings in operating expenses which it is estimated will result from the operation of

the new equipment; and (4) from additional savings which it is estimated will result from further changes in operating methods recommended in the report. While the report admits that while it may be necessary to use a portion of the company's cash working capital in order to carry out the entire program, such is not contemplated beyond the first year. The estimated cash surplus of the new company, after providing for necessary annual improvement expenditures under the program, but before restoration of any cash working capital that might be used, would be for each of the five years as follows:

First year.................................... $1,110,000
Second year.................................... 1,372,000
Third year.................................... 1,435,000
Fourth year.................................... 1,559,000
Fifth year.................................... 2,281,000

Thus, the plan contemplates that not only will there be no necessity to borrow any money whatsoever in aid of its accomplishment, but that by the third year any appropriations from working capital would be restored; all accumulation of interest due on both classes of new debentures for the first and second years of the plan could be paid, that in the fourth year the accumulated interest for the third year could be paid, and that in the fifth year, the accumulated interest for the fourth year and the interest for the fifth year could be paid, and there would still remain net cash surplus available for improvements and dividends on the new preferred stock, estimated as follows:

Third year.................................... $1,241,000
Fourth year.................................... 1,853,000
Fifth year.................................... 2,251,000

Coincident with the major radical changes in equipment, and as a direct aid to the restoration of the company's credit and the financing of the plan over a 5-year period, the report also recommends a variety of changes in the existing methods of operation, which may be briefly summarized as including the following: A tightening up of operating schedules; elimination of duplicate service; substitution of bus for certain rail operations; entire abandonment of some useless service; consolidation of present 17 carhouses into 6; concentration of the various departmental operations at the Carroll Park shops, and changes in operating methods and routines in some

of these departments; construction of an administration building at Carroll Park and the concentration therein of virtually all of the administrative activities of the company, which would cost, it is estimated, approximately $400,000, but the savings thereby, it is estimated, would be approximately $832,000 annually, that is to say, that the additional outlay should be recovered twofold in one year by the resultant savings.

The plan, considered in its entirety, while radical in one sense, is fundamentally not extreme. It is spread over a considerable period of time. It provides that in order to demonstrate gradually to the public the contemplated advantages of the trackless trolley, this form of equipment will be tried out during the first year on only three lines. At the same time, more frequent and experimental service will be afforded with smaller busses on one of the present bus lines. Also, it is recommended that simultaneously experiments be conducted to test the possibilities of a reduced fare, namely, of a 5 cent inner zone fare, of a general token rate of 6 tokens for 50 cents and of a $1.25 weekly pass. No assurance, however, is hazarded in the special master's report as to the success of such experiments, and, in fact, because of past experiences, it is recommended that these experiments be conducted with great caution, and for only short periods of 30 or 60 days.

With a view to still further improving the efficiency of the new operation, efforts at express service are recommended as follows: (1) By restricting rail car operation to the heaviest traffic portions of a long rail route, and substituting express bus service on the outlying remainder of such route; (2) by operating express, over their inner zones, certain long rail routes, serving the local needs of the express territory with a parallel, adjacent trackless trolley line. In other words, it is proposed that rail operation be restricted as far as possible to the heaviest traffic lines and to those portions of such lines where the traffic is most dense, thereby avoiding initial expenditures in any possible needed extension of the present rail routes, or cost of replacement of their lighter traffic portions; and that, where practicable in the future, trackless trolley or bus service be substituted for all outlying portions of rail routes, with express service into the heart

of the city from points where rail service would commence.

Finally, the report deals in no uncertain terms with that privilege which has been allowed to be so greatly abused by the automobile-riding public, as a result of which the street railway company has long borne an undue and unjustly discriminatory burden; namely, automobile parking. This question is so vital to any successful reorganization of the company that the court quotes in full the following recommendations of the special master on this subject, which the court unqualifiedly approves:

"It is becoming increasingly difficult for the United Railways to render a speedy and efficient service to the citizens of Baltimore by reason of the congestion of vehicular traffic in the central business district. Most of the streets in this district are narrow and the traffic tends to concentrate in a few, to become blockaded in many and to eddy around the public markets.

"Baltimore has a comprehensive traffic ordinance regulating vehicular traffic in an attempt to ensure the free use of streets as highways within the district. A strict enforcement of this ordinance would produce an entirely different picture in the downtown area and, in general, result in a restoration of most of the streets to the uses for which they were intended. Unfortunately the privileges granted private vehicles and abutting property owners in the streets are decidedly abused throughout and such streets become more like garages for the storage of automobiles and trucks than highways for traffic.

"Although the streets are generally narrow in this central business district and every foot of highway is needed to provide for the steady flow of traffic through the district, it is safe to say that in reality not more than one-half of the actual street width in portions of many of the streets is available for traffic flow. The other half is preempted by owners and drivers of automobiles and trucks to suit their own convenience, thus depriving the people of Baltimore of the primary use of a large portion of their most needed streets.

"While a strict enforcement of the traffic ordinance would greatly improve the present unfortunate situation, a lax enforcement will, on the contrary, result in its increasing violation and finally in a more or less total disregard of its very reasonable provisions. There are certain heavy traffic arteries within the district which require more rigorous regulation as to vehicular traffic than the present ordinance permits. Streets such as Baltimore, Park Avenue, Charles, and some others, in certain portions thereof, require the complete elimination of parking between 7:30 a. m. and 6 p. m. excepting on Sundays and holidays. This extension of the parking prohibition would result in doubling the capacity of the street for the ordinary flow of traffic and provide four lanes therefor instead of the present two.

"It is difficult to see why right angle parking is permitted at all. The rights of the hundreds of thousands of citizens seeking to use such streets and highways are certainly to be preferred to the convenience of the comparatively few vehicle owners who preempt them for their use. Right angle parking is the greatest possible waste of street space, both in time consumed by the vehicle in its interruption of traffic while working in and out and also in the amount of street space withdrawn from highway use. Curb loading zones greatly facilitate the flow of traffic and provide necessary curb loading facilities.

"In Chicago recently notable results in improving street traffic congestion were obtained by the prohibition of all parking in the central business or Loop district. The number of automobiles entering the restricted area in a given time increased over 20% with the freer flow of traffic and there was an average increase of about 15% in the speed of street cars through such district with a decrease of about 10% in the number of accidents.

"The full enforcement of the Baltimore traffic ordinance and other regulations with their further extension as above suggested, would be of great public benefit in saving the time of most of the 300,000 daily patrons of the United Railways and would also improve the efficiency of its service. No matter how speedy the equipment may be it can not develop its speed if continually slowed down or stopped by useless traffic jams. The waste of money and time of the public arising out of the present situation is beyond calculation. Conditions will grow more difficult as the city grows and an

impossible situation in the near future can only be avoided by a reasonable and growing regulation and control in the present."

In conclusion, the court is fully aware of the many and difficult problems which have faced those in charge of the reorganization of the United Railways & Electric Company of Baltimore, some of which were beyond human power to prevent because of the revolution in methods of transportation which has come upon us in such a relatively short space of time; others, the court feels have been accentuated, if not in fact created, by lack of foresight and prudence, by totally unjustified overcapitalization and overhead expenses, for which the present reorganization should provide a remedy, and an insurance against their repetition.

The company's employees are a body of very loyal and efficient workers. The court again commends them for the fine spirit which they have shown in co-operating with the receivers and trustees in efforts to improve the service and at the same time to save money.

Plans for rehabilitation different from that recommended by the special master may produce the desired results, but the court wishes to reiterate that it believes the basic principles of the special master's recommendations are sound, and that they should be substantially followed if success is to be attained. These recommendations revolve largely around a radical departure from the present type of equipment by the adoption of the trackless trolley car to a very large extent. This type of equipment has advanced beyond the mere experimental stage. Statistics appended to the special master's report show that the trackless trolley car is now in use in 26 different American cities, where its operations show consistent and very substantial gains in revenue over the revenue from rail trolleys and gas busses.

As the report indicates, the trackless trolley car combines, on fixed routes of operation, the best characteristics and advantages of both of these latter types of equipment, without the disadvantages of either, with the exception, however, that, like the gas bus, its carrying capacity is limited by the requirements of its maneuverability. It has unlimited power, smooth and rapid acceleration and deceleration. That is to say, it has all the speed of the electric rail car, but is much lighter in weight. It is free from oil and gas odors, and also combines the flexibility of operation in the street of the gas bus, with its curb pick-up and delivery of passengers, and its ability to dodge and work around obstacles, thereby avoiding interruption of service. It has a field of operation to the extent of 14 feet on each side of the wires. Furthermore, the trackless trolley car is practically noiseless, has a longer operating life than the gas bus, and, in the end, is cheaper to operate and maintain than either of the other types of equipment, a very large factor in connection with which is the avoidance of the necessity to construct and maintain rails. In short, it is an ideal transportation unit for operation even in large cities, except on lines of the greatest traffic density where the revenue is sufficient to justify the investment in and the expense of maintaining the necessary track structures.

Finally, it is, of course, obvious that no plan for rehabilitation of the company can be expected permanently to succeed without the co-operation of all interests involved, including the municipal and other branches of government with whose sanction the utility operates. The court believes that in two major respects, at least, the company now in reorganization is entitled to very much more definite relief from the city of Baltimore than it has heretofore received: First, relief from the excessive burden of taxation represented by the present obsolete paving taxes and the gross receipts tax, because, even allowing for contemplated reduction in the gross receipts tax, any tax imposed upon earnings which is not predicated upon net earnings, would seem to be wrong in principle; and, second, relief from the heavy burden imposed by the present laxity with respect to parking of automobiles in the city streets. Also, the company is entitled to relief, through the Public Service Commission of Maryland, from the unwarranted competition of taxicabs, the present number of which exceeds the public need; and relief from the further undue burden incident to lax enforcement of the laws relating to taxicabs.