WILSON C. WARREN, ET UX. *v.* E. ROY FITZGERALD, ET AL.

[No. 108, October Term, 1947.]

478

*Decided January 14, 1948.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

480

*Herbert E. Witz* and *J. Morfit Mullen* for the appellants.

*Harry N. Baetjer* and *Simon Sobeloff, City Solicitor of Baltimore City,* with whom was *Venable, Baetjer & Howard* on the brief, for all the appellees except the Mayor and City Council of Baltimore.

MARKELL, J., delivered the opinion of the Court.

This is a stockholders' suit to enjoin The Baltimore Transit Company from abandoning almost 50 per cent of its track mileage and substituting for trolley cars motor buses, to be owned by a wholly owned subsidiary, The Baltimore Coach Company, "without having first obtained the authority or approval" of its stockholders. Plaintiffs own 1275 shares of common stock (out of 169,142.61 outstanding) and 100 shares (out of 233,-427.2325) of preferred stock. The bill prays that the company be enjoined from (*a*) "pursuing the aforesaid illegal and fraudulent plans of 'conversion,' whereby the property and assets of said Company are being transferred to The Baltimore Coach Company * * * and many millions of dollars worth of trolley car equipment is to be abandoned" or (*b*) "changing the corporate function of said Company, from that of a local operating street railway company to a mere holding company, without having first obtained the authority or approval of the stockholders of said Company, as by law required." From a decree dismissing the bill plaintiffs appeal.

As appears from the bill, testimony and the opinion below, the case was originally based largely upon charges of fraud on the part of Transit Company's directors. The charges of fraud involved alleged "domination" of Transit Company by National City Lines, Inc., a "holding corporation" which owns almost 30 per cent of the preferred and common stock of Transit Company and also owns stock of local transportation companies in many other cities, and alleged contractual and financial relations between National, "its local operating com-

panies" and certain "supplier corporations" whereby National was furnished "money and capital" by the "supplier corporations," used this "money and capital" to secure control of, or financial interest in, "local transit systems" and purchased and caused its "operating companies" to purchase "tires, tubes, petroleum products and buses" from the "supplier corporations." This mention of the charges of fraud need not be elaborated or made more definite or even more accurate. At the argument appellants stated that the charges of fraud had not been proved and were abandoned. No question of fraud, actual or constructive, is stated in appellants' brief. The only questions argued orally or in the brief were whether the "conversion from trolley cars to motor buses" and from an "operating Company" to a "holding company" is *ultra vires* of the corporation or its directors. Alleged acts, omissions, opinions, knowledge or lack of knowledge of directors may be considered only in so far as they may relate to questions of power, apart from any question of fraud. We may add that no evidence has come to our notice which indicates fraud on the part of any of the directors, either National's "representatives" or Baltimore directors not interested in National. Several of the latter have been directors ever since 1935; one or more of them had then been nominated by Judge Coleman, as "representative" of "the interests of the owners of the property and the public as a whole," and selected from his nominations as voting trustees in the reorganization under section 77B of the Bankruptcy Act, 11 U. S. C. A. Sec. 207, *In re United Railways & Electric Co. of Baltimore's Reorganization,* D. C. 11 F. Supp. 717, 718, 723.

For the purposes of this case it is not necessary to detail the history of Transit Company and its predecessors from 1859 to date or its past and present transportation problems. Much of that history and those problems is written at length in the opinions and records of this court and in the law reports of other jurisdictions. Present transportation and traffic problems are matters

of common (but not expert or informed) acquaintance. To a large extent it will suffice to state appellants' contentions as to the facts and assume (without deciding) that they are true.

Transit Company, which was reorganized under the Bankruptcy Act and renamed in 1935, was originally incorporated under the name "The United Railways and Electric Company of Baltimore" by consolidation in 1899. By that consolidation and previous consolidations and transfers (under statutory authority) it succeeded to the charter powers of upwards of thirty former "street railway" corporations. Until 1890 its predecessors operated only horse cars. One of its constitutent corporations, The Baltimore City Passenger Railway Company, was incorporated by Chapter 71 of the Acts of 1861 and was empowered "to lay down and construct, and to use and operate, Passenger Railways" in the streets of Baltimore. By Chapter 271 of the Acts of 1890 its charter was amended and it was empowered "to use upon any or all of its railway tracks in the city of Baltimore and upon any suburban railways of the said company, any cable system or other system of propulsion by means of stationery engines, any pneumatic motors, stored electricity motors and any motive power and means of traction which the mayor and city council of Baltimore may sanction, or which shall be authorized to be made use of in the city of Baltimore by any other corporation exercising street railway franchises therein." Another constituent corporation, Electric Light and Railway Company of Baltimore County, was incorporated by Chapter 477 of the Acts of 1892 and was empowered to establish and operate "lines of electric railway" in Baltimore County. By Chapter 337 of the Acts of 1896 its charter was amended, its name changed to "The Baltimore and Northern Electric Railway Company," and it was given the right "to lay down, construct, maintain and operate a single or double track railway" upon such streets of Baltimore as should be approved by the City, "with the right to use as a means of traction for its

said cars, electricity, cable, compressed air or other improved motive power (excepting steam)". About 1890 the use of cable cars was begun and before 1899 horse cars (and later cable cars) were superseded by electric trolley cars.

In 1915 operation of motor buses was begun by Transit Company through wholly owned subsidiaries, which in 1926 were consolidated to form The Baltimore Coach Company. Through Coach Company, Transit Company also operated one short trackless trolley line. In the 1935 reorganization Judge Coleman had power and responsibility (which in a stockholders' suit we have not) to consider operating problems to determine whether the plan of reorganization was "feasible". For this purpose he appointed as special master a traffic expert, Charles W. Chase, who submitted a full report of a "Consolidated Rail, Trackless Trolley and Motor Coach Program" and related subjects. Judge Coleman expressed his belief "that the plan which the special master embodies in the report indicates a very feasible manner, if not indeed the most feasible manner, in which the imperative rehabilitation and modernization of the company's service can be accomplished". *In re United Railways & Electric Co. of Baltimore's Reorganization, supra,* 11 F. Supp. 723. He also mentioned that in the report it was proposed "that rail operation be restricted as far as possible to the heaviest traffic lines and to those portions of such lines where the traffic is most dense * * *; and that, where practicable in the future, trackless trolley or bus service be substituted for all outlying portions of rail routes". *Supra,* 11 F. Supp. 725. From 1935 until 1940 bus lines or trackless trolleys were substituted for a number of rail routes and some new bus lines were established. During the War further "conversion" from trolley cars to buses was forbidden; diminution of automobile competition and influx of war workers strained the facilities but greatly increased the earnings of Transit Company and transportation companies in other industrial cities.

At the end of the War, when restrictions on construction and operation of buses were removed, Transit Company says it began planning to meet present and future traffic problems and to mitigate future shrinkage of earnings when automobile competition is fully restored. After consideration, and consultation with independent experts, the result is the present proposed plan of "conversion from trolley cars to motor buses." On October 9, 1946, the Public Service Commission "presently disapproved" the plan as to almost half of the proposed abandonment of track mileage (about 21 per cent out of 46 per cent) and approved the remainder of the plan by an order authorizing abandonment of electric railway service over specified lines (Code, Art. 23, sec. 389) and operation of motor bus lines over specified routes in substitution therefor, granting a permit to operate such motor vehicles (Art. 56, sec. 304; see also Art. 23, sec. 388), and directing Transit Company promptly to submit to the Commission recommendations with respect to changes in its accounting procedure appropriate "to provide for losses to be sustained in the abandonments which will result from the conversion of its street railway lines to motor bus operation." Such recommendations as to accounting changes have not yet been submitted. The plan of conversion from trolley cars to motor buses has already been carried out to the extent of removal of cars and substitution of buses on Charles, St. Paul and Calvert Streets.

Plaintiffs say: The undepreciated book value of the electric railway property proposed to be abandoned (including the part just abandoned and also the part of the plan "presently disapproved" by the Public Service Commission) is about $24,000,000, about 38 per cent of such book value ($62,000,000) of the entire electric railway system. If reserves for depreciation and retirement and for obsolete property were prorated and deducted, the book value less such deductions would be $18,000,000. New buses and garages and other buildings and equipment, which would cost $12,000,000, would be

acquired by Coach Company on the credit of Transit Company and on the security of the buses themselves. By such "conversion" 37 per cent of the (gross) revenues of Transit Company would be "transferred" to Coach Company. Just how these bus purchases are to be financed has not yet been decided. Previous purchases have been financed 20 per cent out of Transit Company's own funds, 80 per cent (to the extent of $2,600,000) by banks on equipment trust certificates or analogous notes secured by chattel mortgages. (See Machen on Corporations, sec. 1912. Cf. Code, Art. 21 sec. 109, Acts of 1882, ch. 215. Whether in this statute "railroad" includes street railway, and how far, if at all, the statute is more than declaratory of previous law, are questions on which we intimate no opinion.)

Plaintiffs contend (1) that Transit Company's directors cannot abandon $24,000,000 of street railway assets, and in lieu thereof purchase, on its own credit, to be owned by Coach Company, $12,000,000 of motor buses and equipment, without approval of its stockholders; and (2) "incidental" to the first contention, that Transit Company's charter power is limited to the operation of a street railway and does not include power to purchase and operate motor buses. We shall consider these contentions in inverse order.

At the hearing below the City of Baltimore intervened, as a party defendant, to advocate the proposed "conversion". The City's intervention cannot change Transit Company's charter, as a contract between stockholders, or subtract anything from plaintiffs' contract rights. Nor does the Public Service Commission's approval change the charter, as a contract between stockholders or as a contract (subject to the reserved power of amendment) between the corporation and the State. The action of the City and the approval of the Commission, and express statutory provision for permits to operate motor vehicles, "in substitution for the whole or any part of an electric trolley car franchise", on application of a company, or a subsidiary of a company, "engaged

in furnishing mass transportation in any incorporated municipality" by electric trolley cars and operating motor vehicles "in connection with or as a service supplementary to a service by trolley cars," Art. 56, sec. 304, are nevertheless reminders that we are now construing a contract between stockholders, not a grant by the sovereign which must be strictly construed.

There is a verbal plausibility in the contention that a street railway corporation has no power to operate without rails. The short answer is that the contention is narrowly verbal and also ignores material words. Power and right to lay rails in the streets was indeed, in 1859 and since, an important grant by the sovereign. It was, however, a grant of a privilege, as a means to an end, not a restriction upon other corporate powers or upon progress. Transit Company has power to use "any motive power and means of traction" sanctioned by the City or any "improved motive power (excepting steam)". Transportation is the end, rails and motive power are means. When new motive power makes rails unnecessary, power to furnish transportation is not lost. If there had been any doubt on this score Transit Company's charter could have been amended at any time from 1935 to 1945 by the voting trustees (who were also directors), who held 100 per cent of the preferred and common stock. Art. 23, secs. 28, 29; *Brown v. McLanahan,* 4 Cir., 148 F. 2d 703, 705, 706, 708, 159 A. L. R. 1058.

In *Leroy v. Worcester St. R., Co.,* 287 Mass. 1, 9, 10, 191 N. E. 39, 43, the title of plaintiff, an abutting owner, was subject to "all the right, title and interest" of a railroad company, to which defendant was successor, "to the land occupied by it at its road and location." The question was whether, as against plaintiff, defendant had power to use its right of way for a motor bus line. In holding that defendant had such power the court said: "This company was formed under St. 1872, c. 53. By this act it had all the powers and privileges set forth in all general laws relating to railroad corporations

except as therein otherwise provided. By Gen. Sts. c. 63, sec. 119, it was provided that, 'No locomotive engine or other motive power shall be allowed to run upon a railroad constructed by authority of this state, except such as is owned and controlled by the corporation owning and managing the road, unless with the consent of the corporation'. A right to use other motive power is clearly implied. It is allowable to infer that the provision includes the power to adopt modern inventions as a source of motive power". 287 Mass. 12, 191 N. E. 43. The court cited: *Bishop v. North*, 1843, 11 M. & W. 418, holding that an Act of Parliament, passed in 1792, granting a right to build and maintain a railway, included the right to maintain a railway for locomotives, although such engines were unknown at the time of the passage of the act; *Howley v. Central Valley Railroads, Co.*, 1905, 213 Pa. 36, 41, 62 A. 109, 2 L. R. A., N. S., 138, 5 Am. Cas. 51, in which it was held that where the statute under which a railroad corporation received its charter provided that "the said company [should] have the exclusive control of the motive power," 67 P. S. sec. 451, the company had the right to adopt electricity as a motive power even though the use of electricity as a motive power was not known at the time of the passage of the act, and it was stated by the court that in the absence of limitation it was the duty of the company to ask what motive power in the light of its experience was best for the operation of its road; *Hudson River Telephone Co. v. Watervliet Turnpike & Railway, Co.*, 1892, 135 N. Y. 393, 32 N. E. 148, 17 L. R. A. 674, 31 Am. St. Rep. 838, holding that a turnpike company, which desired to operate a horse railway and received authority under a New York Act of 1862 to operate its road by "any mechanical or other power" it might choose, might adopt electricity as its motive power. In *Anderson v. Knoxville Power & Light Co.*, 1933, 16 Tenn. App. 259, 263, 64 S. W. 2d 204, 206, it was held that a right of way "for railway purposes", granted by deed in 1913, was not abandoned by changing the railway line to a

trackless trolley, operated in conjunction with and as an integral part of the company's railway system.

If, as we hold, Transit Company's charter powers include power to operate motor buses, as part of an integrated system of mass transportation comprising rail cars, trackless trolleys and motor buses, then it follows that the proposed plan of conversion from trolley cars to motor buses presents a business question which is within the power of the directors and need not be authorized or approved by the stockholders. The "business and property" of a corporation are "conducted and managed" by the board of directors. Art. 23, sec. 9. "The board of directors may exercise all the powers of the corporation, except such as are by law or by the charter or by the by-laws conferred upon or reserved to the stockholders * * *". Art. 23, sec. 12. One business power reserved to the stockholders is authorization of an issue of bonds secured by mortgage of any franchises, Art. 23, sec. 8 (5); before the corporation law of 1908, Chapter 240, authorization of such an issue by stockholders was not necessary. *Machen on Corporations,* sec. 1435. Generally speaking, a corporation's ordinary business powers are vested in its directors; its constitutent powers, relating to fundamental changes in its corporate structure, objects or purposes, are reserved to the stockholders, to be exercised (under present Maryland law) on recommendation of the directors. Art. 23, secs. 28, 29, (charter amendments, including increase of capital stock); sec. 33 (consolidation or merger); sec. 54 (purchase of its own stock) secs. 93, 96 (dissolution), secs. 38, 39 (sale, lease, exchange or transfer of substantially all its property and assets, including its good will and franchises). Plaintiffs rely on sections 38 and 39. " * * * the individual directors making up the board are not mere employees, but a part of an elected body of officers constituting the executive agents of the corporation. They hold such office charged with the duty to act for the corporation according to their best judgment, and in so doing they cannot be controlled in

the reasonable exercise and performance of such duty. As a general rule, the stockholders cannot act in relation to the ordinary business of the corporation, nor can they control the directors in the exercise of the judgment vested in them by virtue of their office. * * * The corporation is the owner of the property, but the directors in the performance of their duty possess it, and act in every way as if they owned it". *People ex rel. Manice v. Powell,* 201 N. Y. 194, 200, 201, 94 N. E. 634, 637. In Maryland the holders of a majority of all outstanding shares entitled to vote may call a meeting of stockholders and remove any director from office and appoint a successor. Art. 23, sec. 13.

Before the corporation law of 1908 or similar modern laws in other states some of the constituent powers of the corporation could be execised only with the consent (or acquiescence) of all the stockholders. In Maryland such powers can now be exercised by the vote of two-thirds of each class of shares, usually with a right to dissenting stockholders of appraisal and payment for their shares. Such statutes mitigate obstructive power of minority stockholders by giving them payment for their stock. "It is, of course, a general rule of law that, in the absence of special authority so to do, the owners of a majority of the stock of a corporation have not the power to authorize the directors to sell all of the property of the company and thereby abandon the enterprise for which it was organized." *Geddes v. Anaconda Copper Mining Co.,* 254 U. S. 590, 595, 596, 41 S. Ct. 209, 211, 65 L. Ed. 425. New York cases over a period of years established the law that "a corporation cannot sell all its property, or even a part thereof so integral as to be essential for the transaction of its ordinary business, because such a sale is wholly or partly an act of self-destruction and a practical dissolution without compliance with law". In 1893 this rule of law was changed in New York by an amendment of the Stock Corporation Law, Consol. Laws N. Y., c. 59, similar to sections 38 and 39 of the present Maryland law.

It was held that, except by compliance with the amended statute, a corporation cannot sell "the 'business assets and property,' including the good will, of an independent and important branch of its business", *viz.*, a certain "department," because "such a sale would * * * be corporate suicide to a certain extent, and to that extent a sale or abandonment of the charter". *Matter of Timmis*, 200 N. Y. 177, 181, 93 N. E. 522, 523. In the same case it was also said, "Notwithstanding the broad language of section sixteen, it is obvious that it was not addressed to ordinary sales by a corporation, nor even to those extraordinary in size, but still in the regular line of its business, for such sales would have been valid without amending the Stock Corporation Law". 200 N. Y. 181, 182, 93 N. E. 524. Referring to the rule of law in question, Mr. Machen says, "This limitation or qualification upon the general implied power of alienation is, however, very narrowly restricted for a company has the implied power to sell out its works or plant for the purpose of acquiring others", *e. g.*, to sell a hotel to purchase another or sell a steamboat company's only boat. *Machen on Corporations*, sec. 78.

Transit Company's trolley lines do not constitute an independent department of its business. They are part—still the greater part, if the proposed "conversion" is fully carried out—of an integrated whole which comprises both cars and buses. Its lines to be abandoned are not an integral part of its property, essential for the transaction of its business; they are, in the judgment of its directors, obsolete parts, to be replaced by substituted parts to make a better, integrated whole.

As a business matter, the proposed "conversion" is extraordinary in size and very important. Before the War it might have been financially impossible, not because of the $24,000,000 "loss" but because of the $12,-000,000 cost. Upon abandonment of obsolete property no economic loss necessarily results, though loss resulting from obsolescence then may be recorded for accounting purposes and perhaps (we suggest no opinion) may

be "realized" for tax purposes. Whether the property is in fact obsolete, and whether the "conversion" is wise, are business questions, not reviewable by the courts when the action of the directors is not fraudulent, illegal or *ultra vires*. Plaintiffs question, but apparently do not squarely deny, the wisdom of the proposed "conversion". They deny the power of the directors and insist that Transit Company "comply with section 38" and "submit this entire plan" to the stockholders for. their approval and "afford any dissenting stockholders the rights established by this statute". Since we hold that the plan is within the business powers of the directors, it is not necessary to "comply with section 38". Section 38 does not restrict the business powers of directors but mitigates the veto power of minority stockholders in matters beyond the directors' business powers.

Plaintiffs' contention that the proposed plan is *ultra vires* of the directors because it will change Transit Company from an "operating company" to a mere "holding company" is without merit. Formation of a corporation, *e. g.*, a "holding company", for an unlawful purpose, like any other contract or act for such a purpose, is unlawful and is not beyond the reach of the law. *Northern Securities Co. v. United States,* 193 U. S. 197, 24 S. Ct. 436, 48 L. Ed. 679. Certain "holding companies", not including street railway or motor bus companies, are outlawed by Act of Congress. But the fact that a corporation is a holding company only, does not make it or its purposes unlawful. *United States v. United States Steel Corporation,* 251 U. S. 417, 437, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121. No common carrier (including a street railroad corporation or an automobile transportation company) can acquire stock of another common carrier existing under the laws of Maryland unless authorized so to do by the Public Service Commission. Art. 23, secs. 388, 344, 345. In *Booth v. Robinson,* 55 Md. 419, 433, 434, it was held that a corporation has implied power to purchase stock of another corporation, if this is done *bona fide* and with no sinister or unlawful pur-

pose and there is nothing in its charter or in the nature of its business that forbids the exercise of such power. Under the corporation law of 1908 a corporation has general power to hold shares in, and bonds, notes and other obligations of, other corporations "which may be appropriate to enable it to carry on the operations or fulfill the purposes named in the charter". Art. 23, sec. 8 (6). From several of its constituent corporations Transit Company has broadly worded "incidental" powers and also power to hold stocks and securities of other corporations. As we hold that its transportation powers include power to own and operate motor buses, it is unnecessary to consider whether, if its transportation powers were narrower, it would have power to operate buses through a subsidiary. It does not appear why it has operated buses through subsidiaries instead of owning them directly, but it has done so for thirty years, apparently without question except in the instant case. At the argument it was intimated that there may be some saving in taxes or at least avoidance of tax problems. In testimony it is intimated that bankers have insisted on ownership by a subsidiary instead of direct ownership. Possibly Transit Company's debentures may contain covenants against liens, and bankers' counsel may have some doubt as to the priority of a lien on buses owned by Transit Company. As Mr. Justice Holmes more than once pointed out, a corporation is a real legal personality. *Donnell v. Herring-Hall-Marvin Safe Co.,* 208 U. S. 267, 273, 28 S Ct. 288, 52 L. Ed. 481; see also *Machen, Corporate Personality,* 24 Harvard Law Review 253, 347. There is a real difference between ownership of stock of a subsidiary and ownership of its property. *Llewellyn v. Queen City Dairy,* 187 Md. 49, 48 A. 2d 322; *Cleveland Trust Co. v. Consolidated Gas Electric Light and Power Co.,* 4 Cir., 55 F. 2d 211. In the absence of evidence of any unlawful or improper purpose, we need not speculate as to why a subsidiary was used in the present plan.

*Decree affirmed with costs.*