NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY *vs.*
WILLARD P. PHILLIPS & others.

Suffolk.   Jan. 25. — May 7, 1886.   HOLMES & GARDNER, JJ., absent.

Under the Sts. of 1876, c. 236, and 1885, c. 8, the trustees under the mortgage
executed by the Eastern Railroad Company are bound to cancel all certificates
of indebtedness of the company purchased by them with the sinking fund pro-
vided for in the mortgage, and are not at liberty to vote upon them in any
meetings of the certificate holders.

Where the court determines, on a bill in equity, the right of certain trustees, under
a mortgage executed by a railroad corporation, to vote at a meeting for the
election of directors on certificates of indebtedness of the corporation, held by
them for a sinking fund, and thus incidentally determines the validity of votes
cast by them, it will not go further and determine who is elected, if it becomes
necessary to determine the validity of other votes cast at the same election.

BILL IN EQUITY, filed January 11, 1886, by the New England
Mutual Life Insurance Company, in its own behalf, and in
behalf of all the other holders of certificates of indebtedness of
the Eastern Railroad Company, issued in accordance with the
provisions of the St. of 1876, c. 236, against Willard P. Phillips,
William B. Bacon, and William C. Rogers, trustees under a mort-
gage executed by said railroad company, and Jacob C. Rogers,
Charles J. Morrill, George E. B. Jackson, and John Cummings.

The bill alleged an issue of certificates of indebtedness
by said trustees under said mortgage to an amount of about
$13,432,920.62; that on December 9, 1885, all of these certifi-
cates were outstanding and unpaid, except such as had been pur-
chased by the trustees since February 6, 1885, (at which time the
market value of the certificates was in excess of par,) claiming
to act under the authority of the St. of 1876, c. 236, and the St.
of 1885, c. 8; that the trustees were the holders of £50,700 and
$89,000 of said certificates of indebtedness; that at an election
for directors of the Eastern Railroad Company, held on said
December 9, there were two tickets containing the names of
different sets of directors; that said trustees cast six hundred
and eighty-five votes for the persons named on one of the
tickets, and these persons were declared elected; that all of
the persons named on the other ticket, except one, would have
been elected, had these tickets been rejected.

The bill further alleged that four hundred and eighty-three votes on certificates owned by Harvard College were cast for the persons on the ticket declared to be elected, which votes, the bill alleged, for reasons which need not now be stated, were illegally cast; and that, if both the votes cast by the trustees and those cast by Harvard College were rejected, the persons on the other ticket would have been elected directors. The prayer of the bill was as follows:

"1. That the court will declare that said trustees have no power to apply any money paid in to said sinking fund under said act to the purchase of said certificates of indebtedness of the Eastern Railroad Company, except at a price not exceeding par, and that it will enjoin the said trustees and each of them, their successors and agents, by both temporary and perpetual injunction, from so purchasing said certificates, until the certificates of indebtedness outstanding have been reduced to ten millions of dollars.

"2. That if the court shall decide that the trustees have power to so purchase said certificates of indebtedness at a price exceeding the par thereof, or at any price, that it will declare it to be the duty of said trustees to cancel every certificate so purchased as fast as bought; that it will order said trustees to cancel at once all certificates already purchased by them out of the said sinking fund, and that it will enjoin said trustees and each of them, their successors and agents, by both temporary and perpetual injunction, from holding or in any way attempting to keep alive and on foot any of said certificates so purchased, except for the purpose of immediately cancelling the same, and only so long as is necessary for that purpose; and that it will further enjoin said trustees and each of them, their successors and agents, by both temporary and perpetual injunction, from registering, voting, selling, or transferring to be voted, or in any way using or attempting to use or recognize any of said certificates as outstanding and valid and votable obligations secured by said mortgage.

"3. That the court will thereupon enjoin said defendant directors and each of them and their agents, by both temporary and perpetual injunction, from directly or indirectly acting or attempting to act as directors of said Eastern Railroad Company for the current year, and from attempting to obtain possession

of any books, papers, or other thing belonging to said office, and from exercising or attempting to exercise any of the functions of said office; and that it will further enjoin said trustees and each of them, their successors and agents, from directly or indirectly aiding or recognizing said remaining defendants, or either of them, as such director, or as having any right to the possession or functions of said office."

The defendants demurred to the bill for want of equity.

Hearing before *Devens*, J., who reserved the case, on the bill and demurrer, for the consideration of the full court.

*W. G. Russell & G. Putnam*, for the defendants.

*S. Bartlett & R. Olney*, for the plaintiff.

C. ALLEN, J. The first question which we have to determine is, whether, by virtue of the provisions of the Sts. of 1876, c. 236, and 1885, c. 8, the trustees are bound to cancel all certificates of indebtedness purchased by them with the sinking fund, or whether they must or may hold them as a permanent investment, and collect from the corporation the interest falling due thereon. And we are of opinion that it is their duty to cancel the certificates as fast as purchased.

Looking, in the first place, at the provisions of the original statute, in the light of the indebtedness of the corporation then existing, which, as gathered from the bill, was about $13,432,920 (to which indeed some addition should be made, as we suppose, for sums secured by outstanding liens, &c.), of its admitted insolvency, and of the fact that its bonds were then much below par, the general scheme of the statute is apparent, and has heretofore been set forth by this court in *Phillips* v. *Eastern Railroad*, 138 Mass. 122, 126. Prominent features in this scheme were, that the whole annual net earnings of the road were to be paid into a sinking fund, to be held by the trustees for the redemption or purchase of the certificates of indebtedness whenever the same could be obtained at a rate not exceeding par, which certificates of indebtedness so obtained were to be cancelled, until the whole amount outstanding should be reduced to ten millions of dollars. Whenever this should happen, the stockholders were to be reinstated in the management of the corporation, and were to choose the whole board of directors Till this should happen, the stockholders were to choose but three

directors, six other directors being chosen by the holders of the certificates of indebtedness. And whenever the whole amount of certificates of indebtedness should be reduced to ten millions of dollars, or whenever a sum sufficient to reduce the same to that amount should be paid into the sinking fund, the sum of one hundred thousand dollars a year, if earned, instead of the whole annual net earnings, was to be paid into the sinking fund. §§ 11, 14. Thus it appears that by § 14 the change of the amount to be paid into the sinking fund is to be made whenever a sum sufficient to reduce the amount of outstanding certificates to ten millions of dollars has been paid in, although, in point of fact, the certificates may not have been actually purchased, and although by possibility the whole original amount may still be outstanding; while the whole board of directors is not to be chosen by the stockholders until the amount of outstanding certificates is in fact reduced to ten millions of dollars. The reason for this distinction is not stated, and it is needless to speculate upon it. It is sufficient to note that, by the express terms of § 11, the purpose of restoring the stockholders to the control of the corporation, by the choice of the whole board of directors, cannot be accomplished till the whole amount of certificates of indebtedness outstanding has been in fact so reduced. This consideration is of importance in determining the duty of the trustees in respect to the disposition of certificates of indebtedness purchased by them under the enlarged power given by the St. of 1885.

At the time when the St. of 1876 was passed, the Legislature apparently did not suppose that the market value of the certificates of indebtedness would rise above par, at least till after their amount should be actually reduced to ten millions of dollars, or till a sum sufficient so to reduce the same should be paid into the sinking fund. No provision was made for investing the sinking fund in any other manner till such time; and the requirement was express, that, until then, the certificates should be cancelled when so redeemed or purchased. Conceding this, the great stress of the argument for the defendants upon this branch of the case is, that after such reduction of the debt there was a change in the duties of the trustees, and that thereafter they must not, or at any rate need not, buy certificates of indebtedness for cancellation, but must or might buy them to be

held as an investment for accumulation, collecting the interest thereon from the corporation ; that after such reduction the fund was to be held for accumulation; that nothing is said in the statute about the cancellation of the certificates thereafter, if purchased; that cancellation would be inconsistent with accumulation ; and that the direction that, after such reduction, the sinking fund should " be held " by the trustees "to be invested" in said certificates whenever the same could be purchased at a rate not exceeding par, and otherwise in the other specified securities, "unless and until the sum so paid in, with its accumulations, shall suffice for the purchase or extinguishment of all said outstanding certificates of indebtedness at par," "said fund to be held as security for the payment of said certificates of indebtedness at their maturity," implies the necessary holding of the whole of said fund as a permanent investment for the ultimate extinguishment of the certificates of indebtedness at their maturity, and not till then.   And, from this assumption of the meaning of the St. of 1876, it is contended, as a logical consequence, that all such certificates purchased under the enlarged powers conferred by the St. of 1885, *c.* 8, must or may be held in like manner.

If this construction were the true one, it would seem to follow that the trustees might, in their discretion, not only buy, but sell, these certificates in the market, the same as other securities held by them in the sinking fund; a result certainly to be deprecated, for obvious reasons.

But an examination of the St. of 1876 does not lead us to the conclusion that any such change in the duty or power of the trustees, in respect to certificates of indebtedness purchased after the reduction of the debt to ten millions of dollars, was intended. The language of the statute does not necessarily imply such accumulation after that time.   Until such reduction, it was assumed that it would be possible to buy them at a rate not exceeding par.   After such reduction, the impossibility of buying them at that rate was contemplated, and provided for, and in such case the trustees are authorized to invest in certain other securities, the income of which would of course be accumulated. The language of the statute as to accumulations is satisfied by referring it to such other securities.   The meaning is the same

as if the words were "with its accumulations, if any," or "if invested in such other securities." The words requiring the sinking fund "to be held" by the trustees, after such reduction, are identical with the words requiring it "to be held" by them before such reduction, when it is conceded that it was to be held by them only for the redemption or purchase of certificates for cancellation. The words "to be invested" are used when provision is made for the possibility of not being able to purchase these certificates at a rate not exceeding par, and a direction in the alternative is given, that the sinking fund is to be invested in these certificates if so obtainable, or otherwise in the securities specified; and the word "invested" is applied to both. Now if it were a plain misuse of the term to say "invested," when preservation for the purpose of collecting income is not intended, there would be some force in the argument. But the word "invest" has no such absolute and universal meaning. It is not uncommon to hear it said, that the best investment of money is in the payment of one's debts. The word does not appear to have been used in the statute in any such strict and technical sense as is supposed, and it would be giving too much effect to its use to hold that the Legislature thereby meant to indicate a change in the duty of the trustees in respect to the cancellation of the certificates, unless confirmation of such construction should be found upon a consideration of the general spirit and purport of the statute.

Leaving now the detailed examination into the meaning of particular words, we find no such intention in the general purpose of the act. There is no good reason why a change should be made, so that the sinking fund should be accumulated after the reduction of the debt to ten millions of dollars, provided these certificates of indebtedness are bought. The Legislature shows no wish to continue the debt longer than is necessary. If the certificates could be bought at a rate not exceeding par, which was the limit to which the trustees could go under the St. of 1876, the trustees were bound to purchase them in preference to any other security, and the simple and direct method of accomplishing the purpose of extinguishing the debt would be to cancel the certificates as fast as obtained. To hold them for accumulation would be a cumbrous method of reaching the ultimate

purpose, and not to be adopted unless plainly required. An accumulating sinking fund was not an object to be favored for its own sake, but only as a means of ultimately paying the debt, if the fund could not be applied towards such payment at once. We search in vain for any apparent reason of public policy or private benefit why so marked a change should be made in the management and disposition of the sinking fund, after the reduction of the debt to ten millions of dollars. It is urged in argument, that, in case the trustees should hold the certificates purchased by them as a permanent fund, as they would hold the other securities specified, they would of course receive from the corporation the interest, and add it to the sinking fund, and the corporation would still be bound to pay to them such interest falling due on the certificates so held by them; whereas, if the trustees should be bound to cancel at once all certificates so purchased by them, the corporation would no longer be bound to pay any interest in respect to such cancelled certificates, and the trustees would not receive any interest upon them to be added to the sinking fund; and thus the creditors would not get the greatest possible benefit, since the corporation would be left free to apply the interest so saved to the payment of dividends to stockholders. It is apparent that, by keeping the certificates uncancelled, and collecting from the corporation the interest thereon, a small sum would be added to the sinking fund, which otherwise would be immediately available for the benefit of the stockholders. But, nevertheless, this objection is not a substantial one. Under the St. of 1876, the trustees were bound to use the whole of the sinking fund, after as well as before the reduction of the debt to ten millions of dollars, in the purchase of certificates of indebtedness, provided the same could be purchased at a rate not exceeding par. No choice of investments in such case was allowed to them. Now, assuming that after such reduction of the debt the trustees could still buy the certificates at par, there appears to be no reason for their accumulating them, instead of cancelling them at once, as theretofore. There is no reason for providing an increased exaction from the corporation in this small and indirect way, when the whole theory of the statute is, that, after such reduction, the debt to the creditors might be treated as substantially

secure, the amount paid into the sinking fund reduced, and the stockholders reinstated in the management of the road. So large a reduction of the debt having been accomplished, the capacity of the road to earn much more than operating expenses and interest on its debt would be established. The annual interest charges would be reduced from over $800,000 to $600,000; the whole annual earnings would no longer be payable into the sinking fund, but only $100,000 a year. It might well be, and obviously was, deemed by the Legislature that the rights of creditors were sufficiently protected without such indirect benefit as that now suggested, if indeed this detailed phase of the matter were thought of at all. To assume that the Legislature intended, by an indirect and circuitous method of keeping alive the certificates, to compel the corporation to pay a little more money than it otherwise would, for the benefit or security of the creditors, is not required by the circumstances of the supposed situation.

Things being so, the St. of 1882, c. 177, was passed, to authorize the corporation to issue preferred stock in exchange for certificates of indebtedness; which was not contemplated in the St. of 1876. This has not been acted on, and has no bearing material to the present case.

Then followed the St. of 1885, c. 8. At the time of its enactment, according to the averment of the bill, the market value of the certificates was far in excess of par. The trustees were in the receipt of money for the sinking fund, but not enough to reduce the indebtedness to ten millions of dollars. Until such reduction, the statute in force did not authorize them to buy anything else but certificates of indebtedness. No certificates had been bought, and none could be, under the existing legislation, by reason of the high market price. The trustees, indeed, might perhaps have applied to this court for leave to invest the money on hand in other securities; but we should hardly have felt at liberty to say that they might buy these certificates at a price above par, and cancel them, when the Legislature had provided to the contrary. The result, therefore, would be, that, no matter what amount of money they might have in the sinking fund, no purchase of certificates could be made; and, under § 11, since the amount of outstanding certificates could not be reduced, no

matter how large the sinking fund might be, the time would not come for the stockholders to choose the whole board of directors until the maturity of the certificates in 1906. In this state of things, the St. of 1885, *c.* 8, was passed. Section 1 is as follows:

" The sinking fund provided for by section fourteen of chapter two hundred and thirty-six of the acts of eighteen hundred and seventy-six may be invested by the trustees in the certificates of indebtedness of said Eastern Railroad Company at market prices, or in any securities in which the savings institutions of the Commonwealth are authorized to invest their funds."

This obviously is to be taken with reference to the previous statute. The creditors having become able, in case they should be willing to sell their certificates in the market, not only to receive the full amounts of their several claims, but a large advance, there was no longer any motive to increase their security. But, owing to the unexpected circumstance of this great increase in the value of the certificates, that part of the scheme which contemplated the application of the sinking fund to the reduction of the indebtedness, and the restoration of the stockholders to full control, was likely to fail. The very prosperity of the corporation would have the effect to exclude the stockholders from its management. The statute of 1885 was designed to meet the difficulties in which the trustees were placed. It authorized them to buy the certificates at market prices; and it gave to them a discretion, even before the reduction of the debt to ten millions of dollars, to invest in such other securities as are allowed to savings banks. The language of the statute is, that the sinking fund may be " invested " in either of these ways; but, as has already been seen, the word " invest " does not necessarily imply a permanent keeping for income. It is used in this statute in the same sense as in the earlier one. Strictly, the word "invest" may be more properly applicable to the other securities. But, as used with reference to the certificates of indebtedness, it would be unreasonable to hold that it has the effect to require the trustees to keep them uncancelled, and thus to defeat the substantial rights of the stockholders. The meaning is the same as if the Legislature had said, " The sinking fund may be used by the trustees for the purchase of certificates of indebtedness at market prices,

or of any other securities in which the savings institutions of the Commonwealth are authorized to invest their funds." If the sinking fund was strictly limited to the purchase of the certificates at market prices, it might so much increase the demand as unduly to inflate the cost. For this reason, as may be presumed, the discretion to invest in other securities was given. But, in the view which we take of the proper construction of the statute, it might reasonably be anticipated that the trustees, though having the liberty to invest in other securities, would give the preference to the certificates of indebtedness, if these could be obtained at a fair price, as compared with the other authorized securities, for the purpose of reducing the debt as fast as possible. Having purchased certificates, we do not find it to be a reasonable construction of the St. of 1885 to declare that they may hold them uncancelled, and as still outstanding.

The result is, that, in accordance with the prayer of the bill, unless upon the coming in of the answer some reason to the contrary should be shown, it must be declared to be the duty of the trustees to cancel every certificate of indebtedness purchased by them with the sinking fund in their hands, as fast as bought. It follows that they are not at liberty to vote upon them in any meetings of the certificate holders ; and it is unnecessary to consider the further proposition maintained by the plaintiff, that, even if for any purposes the certificates might be kept alive, nevertheless it was never contemplated that they should be voted upon by the trustees.

The bill further seeks an injunction to restrain certain persons from acting as directors of the Eastern Railroad, who, it is alleged, were declared to have been chosen at a meeting of the holders of certificates of indebtedness, and who were voted for by the trustees on certain certificates which they held as a part of the sinking fund. Appreciating the difficulty of maintaining a bill in equity for the purpose of directly determining a contested election, the plaintiff contends, in the first place, that the court, being possessed of the cause for the purpose of correcting and restraining a violation of trust, may proceed to enjoin the directors who hold under and in consequence of such violation of trust. The learning of counsel has not furnished us with any instance of such an application of the equitable doctrine invoked

in aid of the jurisdiction, and, after some research, we have been unable to find any. This course is open to the objection, that suits to remove or to institute corporation officers do not belong to the original jurisdiction of chancery, and that the right to be such officer cannot, in general, and in the absence of special legislation affording this remedy, be tested by means of an injunction. 1 Pom. Eq. § 171; 3 Ib. § 1345. It is not a case " cognizable under the general principles of equity jurisprudence." Pub. Sts. *c.* 151, § 4. It would require other parties than those necessary in a proceeding to regulate the execution of the trust; it would be inadequate to put the proper persons in office, and thus would substitute a new and less efficient remedy in place of the remedy by mandamus, which, according to the modern practice in this Commonwealth, is the usual one, and is well adapted to deal at once with the whole question involved in the determination of a contested election. Still, if the whole question as to the election of the directors clearly depended on the determination of the powers of the trustees, all necessary parties being before the court, it would be a matter perhaps entitled to further consideration whether jurisdiction in equity might properly be extended so far. But, however it might be in such case, the state of facts set forth in the bill involves more than this, and it would also be necessary to go on and investigate and determine in relation to the vote cast in behalf of Harvard College, and, for all that we know to the contrary, in relation to other debatable votes that might be set up in the answer, in order to settle the whole question in reference to the election of directors.

The plaintiff's counsel do not contend that the act of presiding at the meeting was an act in the execution of the trust, although it was an act to be performed by one or more of the trustees, if present. If not present, the duty might be performed by any holder of a certificate of indebtedness. In respect to this, it is plain that the trustees merely act as persons designated to perform this specified duty. Indeed, the St. of 1876, *c.* 236, § 1, declares in express terms that the election of directors shall take effect distinctly from, and irrespective of, the trusts created under said mortgage. The plaintiff's counsel also admit that, as a rule, redress in cases of assumed and illegal exercise of office is to be had by the process of quo warranto or mandamus; but

they suggest that, although these remedies may be resorted to by private individuals to correct an intrusion into an office of a private corporation, yet the right to institute the same depends wholly on the discretion of the court, and that it has been settled that, in case of an annual office, leave to resort to either of those remedies will not be given; citing *Howard* v. *Gage*, 6 Mass. 462, and *Commonwealth* v. *Athearn*, 3 Mass. 285. But in modern practice the remedy by mandamus is more freely resorted to and entertained, and indeed it may be said, as in *Kentucky* v. *Dennison*, 24 How. 66, 97, that ".it is now regarded as an ordinary process in cases to which it is applicable." In this State, it has been maintained as a proper remedy to determine the title of the claimant to an annual public office, where a decision could be reached before the expiration of the term of the office; *Conlin* v. *Aldrich*, 98 Mass. 557; and in other cases of annual offices where a petition has been dismissed on the merits, no suggestion has been made that the remedy was not the appropriate one. *Wood* v. *Cutter*, 138 Mass. 149. *Peabody* v. *School Committee of Boston*, 115 Mass. 383. See also *American Railway-Frog Co.* v. *Haven*, 101 Mass. 398. The reasons which governed the decisions in the earlier cases cited are not applicable to the present case, in which a hearing and decision upon a petition for a writ of mandamus, or for leave to file an information in the nature of a quo warranto, might have been reached as early as upon the present bill in equity. Pub. Sts. c. 186, §§ 13, 17–19. See *Braconier* v. *Packard*, 136 Mass 50; *Dechan* v. *Johnson*, *ante*, 23. The particular reason suggested for affording a remedy by means of an injunction in equity therefore fails, and, although the defendants in their argument waive the objection as to this method of trying the title to office, we are of opinion that the bill should not be entertained for the purpose of granting any further relief than in respect to the proper execution of the trust.

The bill being maintained only for the purpose of instructing the trustees, the entry must be,

>    *Demurrer of the trustees overruled: of the other defendants, sustained.*