**BROWN v. McLANAHAN et al.**

Civil Action No. 2324.

District Court, D. Maryland.

Dec. 9, 1944.

Elias Field, Horace P. Moulton, and Donald T. Field, all of Boston, Mass., and J. Cookman Boyd, Jr., of Baltimore, Md., for plaintiff. ·

Venable, Baetjer & Howard, of Baltimore, Md. (Harry N. Baetjer and John Henry Lewin, both of Baltimore, Md.), for defendants other than Safe Deposit & Trust Co.

COLEMAN, District Judge.

This proceeding is now before the Court on a motion of the individual defendants to dismiss the complaint for failure to state a claim upon which relief can be granted.

The action is brought by the purchaser of voting trust certificates representing 500 shares of preferred stock of the Baltimore Transit Company, a Maryland corporation, out of 233,427 of such shares outstanding, for the purpose of having this Court declare null and void the action taken by the voting trustees of the Company on June 21, 1944, in adopting an amendment to the Company's charter, which had been proposed by the directors, whereby voting privileges were given to the debenture holders as well as to the stockholders. That is to say, the Company's certificate of incorporation as amended at the time of the Company's reorganization in 1935 provided that each share of preferred stock entitled the record holder thereof to one vote and three shares of common stock enti-

tled the record holder thereof to one vote, except that holders of record of the common stock should, at all times, be entitled to elect one director, and that so long as any six months installment of dividends on the preferred stock remained in arrears, the holders of the preferred stock should have the exclusive right to vote for the election of all but one director; whereas, the amendment here in controversy provides that, subject to the exclusive right of the holders of the common stock to elect one director, prior to July 1, 1945 (the date when the voting trust expires), each $100 principal amount of debentures entitles the registered holder thereof to one vote; each share of preferred stock entitles the record holder thereof to one vote, and three shares of common stock entitles the record holder thereof to one vote on all matters with respect to which the holders of stock would be entitled to vote, including the election of directors. At the time this amendment was voted, there were outstanding 233,427 shares of preferred stock which had the exclusive right to vote for all but one director because of default in the payment of preferred dividends; and there were outstanding 169,142 shares of common stock which, on the basis of one vote for every three shares, gave to these outstanding shares an aggregate of approximately 56,000 votes.

The Company was reorganized in the summer of 1935 in this Court, as a result of proceedings under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. Summarized very briefly, the plan of reorganization, as finally confirmed and fully analyzed in an opinion which this Court rendered at the time (see United Railways & Electric Co. of Baltimore's Reorganization, D.C., 11 F.Supp. 717), provided for the issuance of three types of securities, i.e., debentures and preferred and common stock. The debentures and preferred stock were issued to the holders of the Company's old first lien bonds on the basis of $500 principal amount of debentures and five shares of preferred stock of the par value of $100 per share for each $1000 principal amount of such bonds. The new common stock was issued to the old common stockholders and to unsecured creditors. The voting rights of the stockholders were vested in voting trustees under a ten year voting trust agreement, which was made an integral part of the plan. Under the plan, the Company issued de-

bentures in the principal amount of approximately $23,000,000.

By the complaint, which is a rather lengthy one, plaintiff brings the suit in the nature of a class action on behalf of herself, she having acquired voting trust certificates for 500 shares of preferred stock of the Transit Company in 1943 and 1944, and on behalf of other owners of preferred stock voting trust certificates who, as is alleged, constitute a class so numerous as to make it impracticable to bring them all before the Court in the present proceeding. The defendants are the Transit Company, the Safe Deposit & Trust Company of Baltimore, trustee under the Company's mortgage indenture, eight individual defendants who comprise the voting trustees, and also, three additional defendants, Bancroft Hill, John L. Swope and John B. Duvall, officers and directors of the Transit Company, who, with the eight voting trustees, constitute the entire board of directors of the Company.

In addition to the aforegoing facts which are set forth in the bill of complaint, and which are to be considered as true for the purposes of the motion to dismiss, the complaint alleges that the preferred stockholders of the Transit Company had, prior to the charter amendment in controversy, a continuing, unalterable right to control the management of the Company, of which they were deprived by this amendment; that by the amendment, the preferred stockholders have been deprived of valuable property rights; that the action of the defendants in adopting the amendment was gratuitous and taken without consideration, contrary to their best judgment and not to the ultimate welfare of the Transit Company and all its security holders; and that no business reason associated with the proper conduct and management of the Company existed for such action.

It is alleged that the motive of the voting trustees in amending the Company's charter was twofold: First, it was desired to perpetuate the present management and control of the Company, after the termination of the voting trust agreement, in the voting trustees in their individual capacities, it being known that many of the preferred stock voting trust certificate holders were dissatisfied with the present management of the Company, whereas the debenture holders, generally speaking, would vote to retain the voting trustees in

control. Second, the voting trustees desired to increase the value of the debentures at the expense of the preferred stock. It is claimed that the giving of voting rights to debenture holders would materially increase the value of the debentures, but diminish the value of the preferred stock, by virtue of the fact that a majority of the voting trustees are either holders in their own right, in substantial amounts, of the debentures or are officers or directors in various local banking institutions which own or control large amounts of the debentures, and the fact that the president of the Transit Company, who is a Company director but not one of the voting trustees, likewise owns a substantial number of the debentures.

The relief sought by the bill of complaint is fourfold: (1) That the action of the voting trustees on June 21, 1944, amending the charter of the Company, be declared null and void; (2) that the voting trustees be removed from office on the ground of breach of their fiduciary duty to the holders of the voting trust certificates, and that this Court designate suitable persons to act in their place pending the final termination of the voting trust agreement, with instructions, in addition to taking the steps necessary to revoke the amendment of June 21, 1944, of the Company's charter, to take the necessary steps pursuant to the corporation laws of Maryland, to remove all of the present directors of the Company and to appoint other and disinterested persons to serve out the remainder of their terms; (3) that this Court order that the voting trust agreement be terminated forthwith, and that the stock held by the voting trustees be distributed to the holders of the voting trust certificates in accordance with the provisions of the voting trust agreement; and (4) that in the alternative, this Court determine the amount of damages sustained by the holders of the voting trust certificates as a class, by reason of the alleged breach of fiduciary duty on the part of the voting trustees, and that they be ordered to pay into this Court the amount of damages so determined, to be distributed ratably among the holders of the voting trust certificates.

The grounds for the motion to dismiss the complaint which has been filed on behalf of all of the defendants except the Safe Deposit & Trust Company, may be summarized as follows: (1) The adoption

of the charter amendment was expressly authorized by the terms of the voting trust agreement to which the plaintiff was contractually bound; and the voting privileges changed by the amendment were never vested rights but were expressly subject to alteration in the judgment of the trustees, in their capacity as stockholders; (2) if justly aggrieved, the plaintiff should have first pursued the remedies afforded her by the voting trust agreement for the removal of the defendants or for the termination of the voting trust agreement; and (3) the complaint fails to show in what manner, if any, the plaintiff or any other certificate holders have suffered, or will suffer, impairment of any rights entitling them to damages because of the action of the defendants.

■ As we have seen, all of the securities of the reorganized Company were issued in conformity with the plan of reorganization confirmed by this Court. Thus, the present plaintiff and all other persons having any interest in the stock of the Company became contractually bound by the terms of the plan of reorganization, and by the terms of the voting trust agreement which was an integral part of that plan. By this agreement (Articles II and VII) the legal title to all of the Company's stock was vested until July 1, 1945, in the voting trustees to whom were delegated exclusively "the entire right to vote" such stock "and the right to otherwise authorize, approve or oppose on behalf of said shares of stock any corporate action" of the Company; and "without limiting the generality or scope of the foregoing provision such rights shall include the right to vote or act with respect to any amendment of the certificate of incorporation of the Company, the increase, reduction, classification, reclassification of its capital stock, change in the par value, preferences and restrictions and qualifications of all shares, * * * as well as every other right of an absolute owner of said shares."

As evidence of the exclusive power vested in the voting trustees with respect to the Company's stock, the foregoing recital of this power is repeated on the voting trust certificates and it is also expressly stipulated thereon that: "The holder of this certificate shall have no right to vote or to direct the Trustees with respect to voting as expressly provided in said Trust Agreement." It is also provided in the trust agreement (Article IX) that the voting trustees shall not "be in any way liable hereunder to any Voting Trust Certificate holder or to the Company or to any other person, except for an act or omission done or suffered in bad faith."

It thus being clear that the present plaintiff's contractual relationship, by reason of the trust agreement, expressly empowered the voting trustees at any time during the life of the trust to adopt "any amendment" to the Company's charter, it is appropriate next to consider the extent to which the Maryland corporation laws permit stockholders to make charter amendments. The pertinent provision of such laws is as follows (Maryland Code, Article 23, Sec. 28): "Every corporation of this State, heretofore or hereafter incorporated, may from time to time and in the manner hereinafter provided, amend its charter and thereby accomplish any one or more of the following objects: The addition to or diminution of the corporate purposes and powers, or the substitution of other purposes and powers in whole or in part for those set forth in the charter; the changing of the corporate business; the changing of the corporate name; the changing of the location of the principal office; the increasing of the authorized capital stock by increasing the number of shares thereof and the classification, if desired, of such increase; the decreasing of the authorized but unissued capital stock by reducing the number of shares thereof; the changing of the number and/or par value of shares of the capital stock or of any class thereof, provided that the total amount of outstanding stock is not thereby increased; the classification or reclassification of all or any part of the capital stock; and *the making of any other amendment of the charter that may be desired,* provided that such amendment shall contain only such provisions *as it would be lawful or proper to insert in an original certificate of incorporation made at the time of making such amendment.* No amendment of the charter of a corporation shall be valid which changes the terms of any of the outstanding stock by classification, reclassification *or otherwise,* in the absence of a reservation in the charter of the right to make such amendment, unless such change in the terms thereof shall have been authorized by the holders of all of such stock at the time outstanding, by vote at a meeting or in writing with or without a meeting; and

in the case of any such change of terms of outstanding stock, the articles of amendment shall, in addition, to other matters required by law, affirmatively set forth that the holders of such stock have duly authorized such change of terms. The word 'terms' as used in this section in reference to stock is intended to mean only the contract rights of the holders thereof as expressed in the charter and shall be so construed." (Italics supplied).

It is entirely clear from the aforegoing statutory provisions that the amending power includes the power to change voting rights. See McQuillen v. National Cash Register Co., D.C., 27 F.Supp. 639, affirmed 4 Cir., 112 F.2d 877, certiorari denied 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450.

It is true that at the time the Company's plan of reorganization and the voting trust agreement became effective, the corporation laws of Maryland did not permit the conferring of voting rights upon other than stockholders. However, the law was amended in 1937 (Maryland Code, Article 23, Section 23) to provide as follows: "Any corporation of this State, heretofore or hereafter incorporated, may by its charter confer upon the holders of any bonds, notes or other obligations, issued or to be issued by such corporation, any voting or other rights which under the law are or may be conferred on stockholders." (Italics inserted.) Such a provision has frequently been held valid. See Phillips v. Eastern R. Co., 138 Mass. 122; New England Mutual Life Ins. Co. v. Phillips, 141 Mass. 535, 6 N.E. 534; State ex rel. Atty. Gen. v. McDaniel, 22 Ohio St. 354. Also Durkee v. People, 155 Ill. 354, 40 N. E. 626, 46 Am.St.Rep. 340, where, unlike in the present instance, the particular State constitution and corporation laws forbid conferring voting power on holders of fixed obligations. See also Fletcher, Cyclopedia of the Law of Private Corporations (Rev. & Perm.Ed.1931), Secs. 2043, 2769.

Thus, from a statutory point of view, there can be no valid objection to the retroactive effect of this provision upon the certificate of incorporation of the Transit Company and the securities heretofore issued thereunder. The authority to grant voting rights to holders of fixed obligations is made both retroactive and prospective as respects such obligations; and as we have seen, by Section 28 of Article 23 of the Maryland Code, at the time of the amendment in controversy, it was lawful for the Transit Company to make any amendment to its charter that was permitted by law at that time. During the past ten or twelve years a number of other States have amended their corporation laws so as to authorize the granting of voting rights to holders of fixed obligations of corporations.

So, although we may assume that it was not in the contemplation of the Transit Company's security holders, officers, directors or voting trustees at the time the voting trust agreement became effective that the Company's charter might be so amended nine years later, any weight to which prima facie this fact might be entitled on equitable grounds favorable to the present plaintiff, is overcome (1) by the fact that the stockholders who became voluntarily bound by the voting trust agreement thereby also agreed to the possibility of such an amendment being made; and (2) by the fact that any subsequent transferees, such as the plaintiff, of voting trust certificates, since they did not acquire their securities until long after the right to do what the voting trustees did had been lawfully conferred upon the voting trustees, must, a fortiori, be treated as having no valid ground to protest.

The question is stressed: Why have the voting trustees waited until the voting trust agreement is approaching its expiration? It is sufficient to say, in answer to this, that unless the voting trustees' action is a shield for or in aid of some unlawful conduct on their part, the question of when they might exercise the power to amend is one of business judgment, and not subject to judicial control.

Without going extensively into the details of the plan of reorganization of the Company which this Court approved, it is of significance that the creation of a voting trust as part of that plan was proposed by the protective committee representing approximately 98% of the first lien bondholders of the old company who were, through their rights of foreclosure, for all practical purposes, the real owners of the Company's property. In a letter dated February 20, 1935, which this protective committee sent to the bondholders explaining the plan of reorganization, the following statement was made: "The voting control of the new company, through the issue of new securities, will be vested in

the present first lien bondholders. * * * Under the plan, the voting control is vested in those having the substantial ownership and first claim on income through the voting power conferred on the preferred stock." Similarly, in the course of its opinion rendered in connection with approval of the plan of reorganization, this Court said (United Railways & Electric Co. of Baltimore's Reorganization, D.C., 11 F. Supp. 717, 719, 723):

"With respect to the court's reasons for approving the plan, the primary reasons may be summarized as follows: * * * Sixth, the voting control, and thereby the management, of the company has been taken out of the hands of the old common stockholders, whose administration of the company's affairs has not, in a number of respects, commended itself to the court, as the court has pointed out on previous occasions during the receivership proceedings, and through a voting trust, has been placed in the hands of those rightly entitled to control and manage the company, i.e., the holders of the new debentures, who stand in the shoes of the old first lien bondholders; the holders of the old junior securities being, however, themselves afforded some representation in the management of the company, as hereinafter referred to.

\* \* \* \* \* \*

"Finally, as to the control and management of the new company under the reorganization, which obviously is of most vital concern, the court believes that a much more enlightened, constructive and economical management of the company's affairs has been assured through the voting trust, which forms part of the plan.

"The court has insisted that the voting trust agreement shall continue for ten years with provision, however, for the right of the preferred stockholders to terminate the agreement at any time after five years upon vote of 80 per cent. of such stockholders; or upon vote of 60 per cent. of such stockholders if concurred in by 60 per cent. of the debenture holders. In the same manner, any of the voting trustees may be changed.

"With respect to the personnel of the voting trustees, the court insisted, as a condition precedent to approval of the plan, that at least a minority of the trustees (the total number of whom has been set at nine) shall be selected from a list submitted by the court. This list was prepared after the most careful weighing of all of the considerations involved in the future management of the company. It embraces, the court believes, only the names of prominent, successful business men of Baltimore City, competent in every way to guide the affairs of the new company, and to bring into the management of the company a progressive approach to the many and difficult problems that will inevitably arise, and at the same time will insure economical methods and all due regard for the interests of the owners of the property and the public as a whole."

In stating in its opinion, as set out above, that the control and management of the Company by the reorganization was placed in the hands of the holders of the new debentures, this Court, of course, meant that this was accomplished through giving to such holders stock as well as new debentures, because under the Maryland law as it then existed, it was only through stock ownership that voting rights could be exercised. That the status of the debenture holders was recognized as being of prime importance is further evidenced by the provisions in the voting trust agreement, referred to in the quotation just made from this Court's opinion.

■ We find nothing alleged in the bill of complaint upon which to predicate fraud or bad faith on the part of the defendants. By the express terms of the voting trust agreement, the voting trustees were made eligible to be directors of the Company and also to own its securities. Such right is generally recognized. The complaint stresses the fact that the action of the trustees in giving voting rights to the debenture holders is improper because the debenture holders "will, it is believed, vote to retain the voting trustees in control of the company after the termination of the voting trust agreement." However, this is merely begging the question because, if the voting trustees are guilty of no improper act in doing what they did, we cannot say that the ultimate result of it, in so far as control of the Company is concerned, may, unless related to some act, past or threatened, that is improper in character, be prevented by court action. As a matter of fact, the Company has prospered under the administration of the voting trustees, has paid all interest charges; has accumulated a surplus of approximately $4,000,000, and the market price of the preferred stock voting trust certificates has increased sub-

stantially since the plaintiff purchased her certificates. It is a source of real gratification to the Court that all save three (two of whom are deceased) of the original board of directors in the selection of a substantial number of whom this Court had a part under the plan of reorganization, are still members of it.

It is unnecessary to consider here the allegations in the complaint relating to the refusal on the part of the voting trustees to declare, in view of the Company's large surplus, dividends upon the preferred stock, because this question was recently fully considered by this Court in a separate proceeding (Spindel v. Baltimore Transit Co., unreported oral opinion of Sept. 26, 1944), and the conclusion reached that the holders of preferred stock voting trust certificates had no legal claim to require the declaration of dividends.

The charter amendment here in controversy, whereby voting rights were granted to the holders of the Company's debentures, was unanimously adopted by the voting trustees. Article VII of the voting trust agreement contains the following provision (paragraph 2): "Any vote or other action of the Trustees whether or not within the authority conferred by, and notwithstanding any other provision of this agreement, which shall be authorized or approved by a majority in interest of the holders of voting trust certificates for either class of stock, Preferred or Common, shall be binding upon the holders of all voting trust certificates of the same class as fully as if all had expressly concurred therein." On behalf of complainant, it is asserted that this provision itself indicates a recognition that there are limitations upon the authority of the voting trustees and that such limitations must be construed to prevent them doing what they have done in the present instance.

While admittedly not, as it reads, free from ambiguity, this provision must be read in connection with Article X of the voting trust agreement, which provides that: "The Trustees may without request therefor and shall at the request in writing of either the Company or of not less than ten per cent in interest of the holders of Voting Trust Certificates of either class, Preferred or Common, call a meeting of all Voting Trust Certificate holders of either or each class *for the purpose of considering any matter affecting the* *rights of the holders of such Voting Trust Certificates.*" (Italics inserted.) After providing for appropriate notice to be given of the time, place and purpose of such meeting, Article X further provides: "At any such meeting the registered holder of a Preferred Stock Voting Trust Certificate shall be entitled to one vote for each share for which his Certificate may have been issued; and the registered holder of a Common Stock Voting Trust Certificate shall be entitled to one vote for each three shares for which his Certificate may be issued. Said vote may be cast by the registered holder in person or by proxy. A majority in interest of the holders of either class of Voting Trust Certificates shall constitute a quorum of that class. * * * *A certified copy of such proceedings or any part thereof, including a statement of the number of Certificates of either class represented by the owner in person or by proxy and of the vote cast for or against any resolution or action certified by such Secretary to be correct, shall, for the purpose of determining the rights of third parties and for the protection of the Trustees and of the Depositary, be conclusive of the facts therein stated, and, shall be prima facie evidence of such facts.*" (Italics inserted.) On behalf of complainant, it is asserted that this provision also itself indicates a recognition that there are limitations upon the authority of the voting trustees, and that such limitations must be construed to prevent them doing what they have done in the present instance.

The aforegoing provisions of Article X of the trust agreement clearly give every holder, such as the present plaintiff, of preferred stock voting trust certificates a right to have such a question as the one here in controversy "considered," at a meeting called by not less than 10% of such holders. This right is of importance in analysing the present controversy, although our construction of the provisions is that any action taken by such certificate holders at such a meeting would not be binding upon the voting trustees, but merely precatory, i.e., the best evidence of what a majority or more of such holders, after formal deliberation, had concluded they wanted the voting trustees to do.

In spite of the very obvious importance of these provisions of the voting trust agreement, because they afford a fair and orderly method whereby holders of voting trust certificates of either class of

stock, preferred or common, are assured of having their grievances "considered" and a vote taken thereon which we must assume would not be ignored by the voting trustees, plaintiff, and those in like position and alleged to be of like mind, have not seen fit to try to take advantage of these provisions. Instead, it is asserted on their behalf with reference to these provisions that: "If the trustees were concerned with the views and the interest of their cestuis, the certificate holders, they certainly would have canvassed their views under these trust provisions. The fact that they took this extreme and unprecedented action without consulting the certificate holders, and indeed, without any notice whatsoever to them, clearly infers that the trustees did not believe that a majority of such holders would approve their action." But, by the provisions of Article X of the voting trust agreement, there is no obligation upon the trustees to call a meeting of certificate holders. They are merely given the discretionary right to do so upon their own initiative, as well as upon request of the certificate holders.

Thus, in the present circumstances, upon the facts as we must accept them as disclosed by the bill of complaint, we are not prepared to say that there was any greater, or as great, a reason for the voting trustees to call a meeting as there was for the certificate holders to do so. At all events, there existed no obligation on the part of the voting trustees to call such a meeting. The Company, with its securities widely held, has long been a storm centre in the financial affairs of Baltimore —just as have similar public utility companies in other cities—and for this reason we may assume it would have helped to allay distrust in the present management of the Transit Company such as that evidenced by the institution of the present suit, if its board of directors and voting trustees had accompanied passage of their resolutions by which the amendment to the Company's charter here in controversy was effectuated, with a full statement, announced to all of the Company's security-holders, of the reasons which it was felt made the amendment advisable. But, again, there was no legal obligation to do so. There was involved merely a question of business judgment with which a court cannot interfere.

It is asserted, on plaintiff's behalf, that it is no defense that the plaintiff has not sought to have the voting trustees removed or the trust terminated, pursuant to the provisions of the voting trust agreement, because neither the removal of the trustees nor the termination of the trust, nor both, would accomplish the desired result; that is to say, the debenture holders would still maintain voting rights and the defendants would still accomplish their wrongful purposes of perpetuating their own control, and improving the value of the debentures at the expense of the stock. It is pointed out that the trust agreement can only be terminated or the trustees removed by an 80% vote of the preferred stock voting trust certificate holders or by a 60% vote of such holders approved by a like vote of debenture holders, and that, therefore, the result sought to be attained would be impossible under this method.

Counsel for plaintiff assert that what the voting trustees have done is similar to the dilution, against his will, of a stockholder's preemptive right. Suffice it to say, we do not find the two situations analogous for the simple reason that the voting trustees are, by virtue of the express terms of the voting trust agreement, the stockholders so long as the trust agreement subsists, in the sense that no one but themselves can exercise the rights which may lawfully be exercised by stockholders.

On behalf of plaintiff it is also asserted that what the voting trustees have done is akin to a case where voting trustees, having the same broad powers that the present voting trustees possess, vote, without the consent of the voting trust certificate holders, a dissolution of the corporation. In this connection emphasis is placed upon the case of Application of Bacon, 287 N. Y. 1, 38 N.E.2d 105, where dissolution of a corporation by the voting trustees was declared to be beyond their power.

But here again, we consider the analogy to be very imperfect. In the New York case, the voting trust agreement provided that after three years the voting trustees shall call a meeting of the holders of voting trust certificates for the purpose of affording them an opportunity to vote on whether or not the business of the company should be liquidated, in whole or in part. Such a meeting was duly called and held, and the holders of the voting trust certificates voted against the company's dissolution. In holding that an intention to give the voting trustees the power to consent to the dissolution of the corporation after the

holders of the voting trust certificates had voted against dissolution is not to be read into the voting trust agreement, and that it cannot be said that merely by a stockholder depositing his stock under that agreement he authorized the voting trustees to vote his stock for dissolution, the Court said (287 N.Y. 1, at page 7, 38 N.E.2d 105, at page 107): "The broad language of that provision [of the voting trust agreement] should not be construed, however, to include power to consent to the destruction of the stock deposited under the agreement. Possible doubt, whether 'the right to vote or give any consent in respect of any and all' the shares deposited excludes power to consent to a dissolution of the corporation disappears when that power is read with the condition or proviso that at the expiration of three years a meeting must be called at which the holders of the voting trust certificates should vote whether or not the business should be liquidated in whole or in part. Such a meeting was called and the stockholders voted against dissolution. An intention to give the voting trustees the power to consent to dissolution of the corporation after the holders of the voting trust certificates had voted against dissolution cannot reasonably be read into the agreement."

Thus, the factual distinction between this New York case and the present case is clear and definite: in the New York case, the holders of voting trust certificates were expressly given the right to vote upon the question at issue, which the Court held implied a right to *determine* that question; whereas in the present case, no such specific right is given to the certificate holders, but at most merely the right to express, record and make known their views to the voting trustees—a right which the present plaintiff has never attempted to exercise although a method for doing so is prescribed.

In the present case, there is no actual *destruction* of the voting position of the preferred stock certificate holders. They still retain their majority. Before the charter amendment, these certificates represented an 80% vote, the common stock voting trust certificates representing the remaining 20%. As a result of the amendment, control is still represented by the preferred stock voting trust certificates because, while their proportional representation is reduced, it becomes approximately 46% as against 42% for the debenture holders, and 11% for the common stock voting trust certificates.

It seems unnecessary, for the purposes of the present case, to enter into a consideration of the legal distinctions between voting trusts and conventional trusts, and therefore, between voting trustees and ordinary trustees. See State Tax Commission v. County Com'rs of Baltimore County, 138 Md. 668, 114 A. 717. Because, of course, it must be treated as axiomatic that voting trustees, just as all other trustees, may not use their voting power to the detriment of, or in hostility to the interest of the persons who are owners of the shares of stock they temporarily represent, because thereby, they would commit a breach of trust. So, just as in the case of other trustees, voting trustees may not use their fiduciary powers for the furtherance of their own interests, to the detriment of the interests of those whom they have undertaken to represent. As we have already seen, the voting trust agreement expressly contemplates that the voting trustees might own, in their own individual capacities, the securities of the reorganized company. There is nothing disclosed by the pleadings in the present case showing that any of the voting trustees have an interest in such securities, either as a result of investments made prior to the reorganization or as a result of after-acquired purchases, of such an extensive character as would indicate that their own personal interest in such securities has dominated or will be likely to dominate or unduly influence their judgment with respect to what would be best for all of the security holders of the new Company. It was disclosed in the course of the hearing that only four of the voting trustees have any personal holdings whatsoever in any of the debentures; that the interest of only one of these four may be said to be substantial in amount, and is, in fact, very small in relation to the total amount of the company's outstanding securities of the same or any type.

It is urged upon us that the present action of the voting trustees is nothing more or less than an indirect, veiled effort to perpetuate themselves in office after the expiration of the voting trust agreement, which must expire by its express terms on July 1st, 1945. We are referred to such cases as Friedberg v. Schultz, 312 Ill.App. 171, 38 N.E.2d 182, a decision of the Appellate Court of Illinois. There, the Court was asked to, and did, restrain voting trus-

tees from electing themselves directors for an annual term which would extend eleven months beyond the expiration of the voting trust agreement. The voting trust had been established in connection with a reorganization under Section 77B of the Bankruptcy Act, and the voting trustees had, in conformity with the plan of reorganization, just as in the present case, originally elected themselves directors of the reorganized company. The voting trustees contended that under the provisions of the Illinois Business Corporation Act, they, as shareholders, could properly elect the directors of the company for a period of one year even though it was known at the time of the shareholders' meeting that they, the voting trustees, would cease to be shareholders before the full year had expired. The Court said (38 N.E.2d at pages 183, 184): "The voting trust agreement expressly provides it shall terminate on the 18th of November, 1941, and that the trustees shall within thirty days after that date turn over the property to the persons entitled thereto. The three trustees who are officers and directors of the hotel are expressly required by the terms of the voting trust agreement to turn over the property to the persons entitled thereto. This would not be accomplished within the meaning of the trust agreement were the directors and officers of the hotel authorized to control the property for a period of about eleven months after it was delivered to the true owners."

It will thus be seen that the question before the Court in the Illinois case is distinctly different from the one now before us. We have no right to assume that the voting trustees of the Transit Company will do anything to extend their control as directors of the Company beyond the life of the voting trust agreement. On the contrary, we must assume that upon its termination next July 1st, the voting trustees, in accordance with the implied if not expressed requirement of that agreement, upon their surrendering as required to do (Article VI) to the Company's shareholders their shares of stock, or the proceeds or avails thereof, will do nothing to interfere with the right of each and every holder of any class of the Company's securities which carries the right to vote, to take over completely the control of the Company through the exercise of that right.

Because of the alleged inpairment of the preferred stock certificate holders'

rights, as an alternative to this Court requiring that the voting trust agreement be terminated forthwith and that the stock held by the voting trustees be distributed to the holders of the voting trust certificates in accordance with the provisions of the voting trust agreement, it is sought to have this Court assess the damages sustained by the holders of the preferred stock voting trust certificates as a class; and to require the voting trustees to pay into court the amount of damages so determined, the same to be distributed ratably among the holders of the preferred stock voting trust certificates. However, there is no showing of any actual pecuniary loss as a result of the charter amendment. The amendment was adopted on June 21st, 1944. It appears from the pleadings that whereas the market price of these voting trust certificates did not exceed $10 per share at the time plaintiff acquired her certificates, the market price since the adoption of the amendment has been as high as $12⅜ per share. No facts are pleaded which are inconsistent with the view which may reasonably be taken, that the value of such stock may, in fact, continue to be enhanced by sharing its voting control with the debenture holders, because they are the ones who have the real financial investment in the property and who, therefore, may be presumed to have a greater incentive than any other class of the Company's security holders, to see that the Company is well managed.

Plaintiff asserts that had it been the intention that all the securities issued upon the Company's reorganization should have voting power, this could have been accomplished easily either by the issuance of a prior preferred stock in lieu of debentures, or by tying the debentures and preferred stock together in such manner that neither would be transferrable without the other; and that the fact that the preferred stock was not so restricted but issued as a separately transferrable equity security, indicates that there was no thought that voting rights should in any way inhere in or follow the debentures.

All of the circumstances and basic reasons involved in the Company's reorganization when fully analysed and understood, refute the accuracy of these statements. But, in any event, as has already been shown, the voting trustees, by virtue of the broad powers given them under the voting trust agreement, have never been

·restricted by any mere *intention* or *assumption* on the part of any of the Company's security holders at the time that they, the voting trustees, assumed their stockholders' duties.

Plaintiff further argues that if what the voting trustees have done is lawful, then they could, with equal justification, vote to reduce the par value of the preferred stock to $50, create a new class of prior preferred stock with a par value of $50, with voting power, and could distribute it ratably and gratuitously to the debenture holders. However, the very statement of this proposition refutes it as an analogy. In the case supposed, part of the value itself of the preferred stock, that is, a property right, would be taken from those who owned it, and gratuitously transferred to another class of security holders.

To summarize and conclude, we find that there is ample ground to support the motion of the individual defendants to dismiss the complaint. That is to say, we find (1) that the voting trustees have not exceeded the authority granted to them by the express provisions of the voting trust agreement, to which the plaintiff and all other owners of preferred stock voting trust certificates of the Transit Company were contractually bound; and (2) that the complaint completely fails to disclose in what manner, if any, the plaintiff or any one in like status, has suffered or is likely to suffer impairment of any of their rights such as to entitle them to any redress because of what the individual defendants have done. It should be added that, a fortiori, no cause of action has been made out against the remaining defendant, the Safe Deposit & Trust Company of Baltimore, since that defendant is joined in the action merely because it is the trustee under the mortgage indenture securing the Company's debentures; because it holds, as trustee in various accounts, a large number of the debentures, and because, pursuant to the provisions of the trust indenture, it became its duty to give notice to the debenture holders (which duty has been duly carried out but the requisite debenture holders' approval not yet sought because of the pendency of the present suit) of the change in the Company's charter, approval by the holders of at least 50% of the debentures being necessary to make such change effective. Since the change is one favorable to the debenture holders, it is to be as-

sumed, of course, that their requisite approval will be forthcoming.

For the reasons herein given, the complaint must be dismissed, the plaintiff to pay the costs.